THE SARCO COMPANY OF NEW JERSEY, a corporation, complainant,

*v.*

ALTA R. GULLIVER, defendant.

[Decided June 10th, 1925.]

**Good-will—Contract Between Employer, Public Stenographer and Reporter, With Defendant, For Services, the Terms of Which Are Set Out at Length, Including Agreement Not to Work Within Limited Territory For Five Years After Termination of Employment, Except on Certain Terms—Negative Covenants of Kind in Question Enforceable—Agreement Not Difficult to Comprehend—Not Against Public Policy— Not Harsh or Unreasonable.**

On final hearing.

*Messrs. Perlman & Lerner,* for the complainant.

*Mr. George W. Macpherson,* for the defendant.

BUCHANAN, V. C.

Complainant's business consists, *inter alia,* of taking stenographic reports (and furnishing transcripts thereof), of court trials and proceedings of various commissions, departments and organizations, through stenographic reporters in its employ or furnished by it. Defendant was formerly in complainant's employ as such a stenographic reporter, under a written contract of employment which contained a negative covenant by defendant restricting her right to employment or activity in competition with complainant, within certain territory for five years after the termination of the employment.

Complainant sues to enforce that covenant and restrain defendant from violation thereof, and for an accounting and

payment of amount due complainant under the terms of the contract.

The contract was made December 1st, 1921, and reads as follows (omitting formal parts):

"1. That in consideration of the employment of the party of the second part by the party of the first part as hereinafter set forth, the party of the second part does bind herself and agree to and with the said party of the first part that she will, as and when requested by the party of the first part, while in its employ, from time to time, perform for the party of the first part such services as may be required by said party of the first part as court reporter.

"2. That the compensation for such services shall be a commission of seventy-five [75] per cent. of the gross amount received for attendance fees and transcript sales; and the said party of the second part shall draw upon said commission at the rate of seventy-five dollars [$75] per week, or in such other amount as may, from time to time, be mutually agreed upon between the parties.

"The said party of the first part agrees to take all necessary and proper means to enforce prompt payment of all accounts due to it in which the party of the second part has an interest, and further agrees that when payment is made to it, it will turn over to the party of the second part her share of the amount paid, provided the party of the second part has not already drawn said moneys through her drawing account.

"3. It is further agreed by and between the parties hereto that all expenses incident to attending hearings and furnishings transcripts, including traveling expenses [where same is not borne by the party ordering such service], testimony papers, covers, carbon paper, typewritten ribbons, fasteners, &c., shall be borne by the party of the second part; and that the party of the second part shall be supplied without cost to her, with a suitable office and such furniture as is now contained in the present reporters' office and a typewriter in satisfactory condition.

"4. The party of the second part further agrees that if, while she is connected with the party of the first part, there should come to her, directly or indirectly, any employment to act as court reporter, that the said party of the second part shall perform such work and service, and such work and service shall be considered as having been received from the party of the first part, and be subject to such terms as to commission and expenses as if such work had been procured by the party of the first part, as above set forth. This clause, however, is not to conflict with any of the conditions set forth in paragraph nine of this agreement.

"5. The party of the second part further agrees that she will not at any time before the expiration of the term of five years hereinafter mentioned in paragraph seven of this agreement, after the severance of her connection with the party of the first part, perform any reporting work in the territory of the party of the first part, viz.,

within a radius of fifty [50] miles of the city of Trenton, with the exception of the cities of Philadelphia and New York, except subject to the terms of this agreement; and should the party of the second part so sever her connection with the party of the first part and accept such work and receive full remuneration therefor, provided such work obtained by her is to be performed within the State of New Jersey, or for any clients of the party of the first part, who were such clients at or prior to the time of severing connection between the parties hereto, such business shall be turned over to the party of the first part at the usual exchange rates, which are twenty-five per cent. of attendance fees and testimony if done by the party of the first part, and seventy-five per cent. of attendance fees and testimony if done by the party of the second part.

"6. The party of the second part hereby agrees to execute a bond to the party of the first part, upon its request at any time for the sum of one thousand dollars [$1,000] for the faithful and equitable performance by her of all the terms and conditions of this agreement, said bond to be obtained at the expense of the party of the first part. Recovery from the bondsman of any sum shall not stop the party of the first part from prosecution of any other remedies or relief by injunction.

"7. The said party of the second part further agrees with the said party of the first part that if at any time she should sever her connection with the party of the first part, she will not enter into any business, personally or through any company or corporation, within the aforesaid territory, which will conflict with the interests of the party of the first part, for the period of five years after the discontinuance of her employment by the said party of the first part.

"8. It is further agreed that if there should come to the party of the second part, through her association with the party of the first part, any opportunity to act as official court reporter either by civil service appointment or otherwise, for which a salary is paid and where transcripts may be sold in addition, the parties hereto shall agree to and with each other what shall be a fair division of such salary and receipts.

"9. It is further agreed by and between the parties hereto that the employment of the party of the second part may be terminated by either party upon the giving of a three months' notice in writing from either party to the other."

There is little dispute as to the material facts. The proofs show that complainant is in the business above mentioned; that it was incorporated in 1919 as the successor to, or reorganization of, the Stenography and Reporting Company, which had carried on a similar business for some years before under the same management; that defendant had applied for and received from the original company in 1912 employment as a stenographer; that she had not theretofore acted as a re-

porter of such trials or proceedings; that complainant (and its predecessor company before it) had an extensive business and good-will or clientele in that line of business; that complainant's predecessor had introduced defendant into the work of reporting for it such trials and proceedings; that from the nature of the work defendant was brought into close personal contact with, and knowledge of, complainant's clients or customers, complainant's contact with such customers being largely through the reporter actually doing the work; that defendant continued in the employ of the complainant's predecessor and complainant until September 1st, 1924, the employment subsequent to December 1st, 1921, being under and pursuant to the contract of that date; that in March, 1924, defendant gave written notice to complainant to terminate the employment, which was terminated September 1st, 1924; that complainant had reminded defendant of the continuing effect of the negative covenant; that in August, 1924, defendant, herself, or by her agents, told complainant the contract was no good, and that was why defendant had signed it, though she had not said so when she signed it; that since September 1st, 1924, defendant has done work and received employment without making payment to complainant in contravention of the terms of the contract and claims to be entitled so to do

The only thing as to which there was any real conflict of testimony was as to the character of the office furnished defendant by complainant in performance of its contractual obligations (paragraph 3) from the spring of 1922 until August, 1924, which will be mentioned hereafter.

It is entirely settled that negative covenants of the kind in question, ancillary to contracts of sale or of employment, are valid and enforceable, if reasonable in their terms. *Flickenstein Brothers Co.* v. *Fleckenstein, 76 N. J. Law 613; Owl Laundry Co.* v. *Banks, 83 N. J. Eq. 230,* and numerous other cases in this state. The most recent pronouncement is in *Nachamkis* v. *Goldsmith, 3 N. J. Adv. R. 698* (at p. 701), where the court of errors and appeals reiterates "that an agreement not to engage in or pursue a particular business

or profession, when made on a good consideration, with one whose business interests it is to prevent competition, is valid, if restrained within reasonable limits, is too well settled to be regarded as an open question."

Defendant's counsel does not seek seriously to controvert this, but argues that the "contract" here is unreasonable and against public policy for several reasons, the first of which is that the contract has no time limit. This argument is difficult to comprehend. The contract of employment, it is true, has no time limit as to its duration (except that it might be terminated on three months' notice), but complainant is not seeking to compel defendant to work for it. It is the negative covenant that is sought to be enforced, and that has a time limit of five years.

Five years is the period of limitation fixed in the most of these negative covenants. So many covenants with a five-year limitation have been upheld and enforced in this court, that the question of the reasonableness of that period needs no further argument, especially when considered in conjunction with the facts of this case—the character of the business, the length of time complainant and its predecessors had been building up the business, and the unlimited period of complainant's corporate existence.

It is next argued that "the provisions for termination does not relieve defendant of the terms," but she is compelled to work for complainant for five years further on less advantageous terms. This argument is also difficult to understand. It is not in accordance with the facts. Defendant, under the terms of the contract, is not compelled to work for complainant. She is prevented for five years from working in competition with complainant, but may, if she choose, do work during that time, and receive the same pay as theretofore, the only difference being that she provide her own typewriter and her own room to typewrite These differences are, obviously, not great, and, on the other hand, she need only work when and so long as she desires. In this particular the negative covenant is far less exacting on defendant than the majority of such covenants, which usually pro-

hibit all work in competition in certain district and for a certain time.

It is also contended that the territory is too wide, and, hence, the provision is unreasonable. In view of the uncontradicted evidence, and the admissions of defendant, that complainant's business covers, not only the State of New Jersey and the cities of New York and Philadelphia, but also many cities over a large part of the United States, this contention of fact must be regarded as disproved.

A question of interpretation of the meaning of the restrictive covenant arises in this connection. The covenant (paragraph 5 of the contract) provided that defendant shall not perform reporting work within a radius of fifty miles of the city of Trenton with the exception of the cities of Philadelphia and New York, "excepting subject to the terms of this contract." This latter clause can only refer to the succeeding povision of the same paragraph, which says, in effect, that she may accept "such work," but shall turn over to complainant twenty-five per cent. of the fees for attendance and testimony, "if such work is to be performed within the State of New Jersey," or for former clients of complainant. The words "such work" (in the provision which permits her to accept "such work" on the terms stated) evidently must refer to the prior-mentioned reporting work within a radius of fifty miles of Trenton, excepting New York City and Philadelphia The contract is to be considered most strongly against the complainant, and upon that principle it would appear that the meaning of the whole covenant is that defendant will not, for the five-year period, perform reporting work within the city of Trenton and within such part of the State of New Jersey as is within a radius of fifty miles from Trenton, nor outside the State of New Jersey within such radius (excepting New York City and Philadelphia) for persons who were clients of complainant at or prior to the termination of defendant's employment, without turning over to complainant twenty-five per cent. of the fees received therefor; and, conversely, that for all such work which de-

fendant does perform she will turn over to complainant such portion of the fees.

Defendant contends the contract is against public policy because of the clause which provides that, if defendant obtains an appointment to an official position as reporter, the parties shall agree on a division of the fees. Aside from the fact that this clause amounts to nothing, for there is no way to compel an agreement as to division of fees, it is sufficient to point out that that clause is separate from and independent of the covenant in question, and is not sought to be enforced. Hence, it does not militate against the enforcement of the covenant in question. *Cf. Fleckenstein* v. *Fleckenstein, supra; Trenton Potteries Co.* v. *Oliphant, 58 N. J. Eq. 507; Erie Railroad Co.* v. *Union Locomotive Co., 35 N. J. Law 240; Stewart* v. *Lehigh Valley Railroad Co., 38 N. J. Law 505.*

The next point made by defendant is that defendant's services are not of a kind requiring unique skill and ability. It would seem that counsel is confusing this case with the class of cases where injunction is sought against the violation of a covenant to perform services. There is nothing in the law as to the enforcement of these *negative* covenants, so far as I am aware, which makes unique skill or ability a factor in the case. It is simply a question of reasonable protection to the employer (or vendee of a business) against competition by the covenantor who has received consideration for the covenant. *Cf. American Ice Co.* v. *Lynch, 74 N. J. Eq. 298; Owl Laundry Co.* v. *Banks, supra; Eureka Laundry Co.* v. *Long, 35 L. R. A. (N. S.) 119,* and note on *p. 120.*

Defendant next urges that reporting work constitutes only one-sixth of the total business of complainant, but is the whole of defendant's business, so to speak, and that the damage to defendant from the injunction would be far greater than the damage to complainant by denying the injunction, hence the injunction should be refused. I am unable to perceive what the cited percentages of the respective business have to do with the question at issue, and, furthermore, the premise as to the damage to defendant is

unsound. As has already been pointed out, the damage to her is slight; she is not prevented from employment even in the restricted area, if she pays to complainant the same percentage as was in effect during her actual employment, the only difference being the furnishing of her own typewriter and room (which might be in her own home). If what defendant really means to argue is that the contract will not be enforced if harsh or unreasonable, the answer is that, as has already been noted, the covenant is neither harsh, oppressive or unreasonable as regards defendant, nor is it unreasonable or beyond the reasonable requirements of due protection to complainant's business. *Nachamkis* v. *Goldsmith, supra.*

Defendant further contends that the covenant is unreasonable, in that it binds defendant for five years irrespective of whether complainant shall so long continue in existence and in the reporting business, citing *Mandeville* v. *Harman, 42 N. J. Eq. 185* (at p. *191*). That case was entirely different from the case at bar. It was the case of a physician (physicians in this country being unable to build up a good-will which can be transferred), and there was no time limit on the negative covenant, which was therefore held not to be within reasonable limits, and, therefore, void. In the present case complainant has a good-will, as is apparent from the evidence, and that good-will might be transferred to an assignee on a sale of complainant's business, and its value be a material factor in the consideration for the sale. There seems no doubt, especially in view of the decision in *Scherman* v. *Stern, 93 N. J. Eq. 626,* but that this argument of defendant is untenable.

Another argument put forward by defendant's counsel is that the covenant is without adequate consideration, citing *Marvel* v. *Jonah, 81 N. J. Eq. 368* (at p. *373*). That case in nowise supports his contention. The covenant there was a part of a partnership contract, and Vice-Chancellor Leaming expressly says "it is impossible to here determine that the benefits and disadvantages flowing from its mutual covenants were inadequate to support the engagement of defendant to refrain

from practice at the place and during the time specified at the termination of the partnership." Of course, it is true that a valuable consideration for the covenant is necessary, but that consideration is found in the contract itself, the mutual covenants being mutual considerations. The covenant is a part of a contract, as in almost all of the numerous cases of this kind, and it is never required that a separate and distinct consideration for the particular restrictive covenant be shown, as indeed is set forth in the *Marvel Case* (at *p. 373*). That there was a valuable consideration moving to defendant in the present case is evident on the face of the contract, the employment of defendant and remuneration to be received by her therefor—employment which was sufficiently profitable to her for her to continue therein for some three and one-half years.

The answer also sets up in defense allegations that complainant did not perform the contract on its part, in that it did not turn over to defendant promptly the moneys due her, and did not furnish her with the required furniture or suitable office in which to work. Evidence is entirely lacking in support of the allegations as to the moneys and the furniture. Defendant herself testified as to the failure to supply suitable office, but the defense cannot be sustained either in fact or in law. The office of which she complained was one into which complainant moved her in the spring of 1922. She occupied it until she left at the end of August, 1924, with the exception of a period of some three months, about August, 1923, when she was ill with neuritis. It is evident that the office was not as good as the one previously supplied her, but, on the whole evidence (and the burden of such affirmative defense is on defendant), I am unable to say that it was not a suitable office, under the contract. Since her leaving it has been occupied by others doing similar work, who testify it is satisfactory, and, although it appears defendant made some complaint while she was there, she never attempted to rescind or terminate the contract by reason thereof, nor to occupy another office and charge the expense to complainant, and her actual leaving and notice thereof

was not put upon the ground of the alleged failure to supply suitable quarters. Her statement that the condition of the office caused her neuritis cannot be considered, for there is nothing to show that she had any medical skill or knowledge. Moreover, the defense could not avail as against the restrictive covenant, for the two covenants are not interdependent.

It is set up in the brief that defendant's necessity for employment compelled her to accept the contract regardless of danger of imposition and oppression. There is no evidence whatever of this, even if it were a valid defense, and it has already been shown that the enforcement of the contract is not an imposition or oppression upon her.

It is also set up that the effect of an injunction would be equivalent to ordering defendant to work for complainant. This, of course, obviously is not so.

It seems entirely clear that, under the contract, the admissions and the evidence, the equities are with complainant, and complainant is entitled to decree restraining defendant from interdicted employment hereafter unless she performs the condition of payment, and for an accounting and payment of such amount as is thereby found due, for the complainant's share, under the covenant, of the remuneration received by complainant for the work heretofore done by her in the restricted area.