**SINGER v. A. HOLLANDER & SON, Inc.**

Civ. A. No. 1033–49.

United States District Court
D. New Jersey.
June 30, 1952.

McGlynn, Weintraub & Stein, Newark, N. J., for plaintiff.

Ruback, Albach & Weisman, Newark, N. J., for defendant.

FORMAN, Chief Judge.

Plaintiff, Philip A. Singer, in his complaint, sets forth, among other things, the following allegations:

Upon the failure of a corporation of which he and his brother were co-owners, the defendant, A. Hollander & Son, Inc., in November of 1939 accepted plaintiff's oral proposal to take charge of the plant of defendant in Long Branch, New Jersey at a

salary of $150 per week and proceed to process rabbit furs using formulae devised and owned by the plaintiff; that a written contract of employment, dated February 10, 1940, and running until December 31, 1944, was presented to plaintiff by defendant but it was not executed until subsequently, in the spring or early summer of 1940; that differences arose between plaintiff and defendant during the year 1942 and plaintiff sought to be released from the contract but defendant refused, and on or about January 1, 1943, suspended plaintiff from the performance of his active duties pursuant to Paragraph "Eighth" of the agreement in which state he was continued until the terminal date fixed in the contract, that plaintiff demanded that he be given work or released from the contract, but his request was refused.

That the contract, and particularly the restrictive provisions of its Paragraphs "Fourth" [1] and "Eighth" [2] constituted agreements in restraint of trade or commerce among the several states and with foreign nations and are illegal under the Sherman and Clayton Anti-Trust Acts, 15 U.S.C.A. Chapter 1.

That plaintiff and defendant were processors of furs in the course of which commerce among the several states and with foreign nations is affected and that the restrictions complained of were intended to operate and did operate to prevent or reduce competition .

"(a) as to the price to be paid for processing services; and (b) the introduction of new colors on furs of better quality thereby depriving the public of the benefit of reduction in price of the processing service and of the finished garment by reason of competition and the increase in the finished products by reason of the introduction of new colors of furs."

That prior to 1940 plaintiff was an active competitor of defendant in several branches of the industry and that the contract and Paragraph "Eighth" were intended to enable defendant to place plaintiff in a state of idleness so as to prevent plaintiff from re-

1. "Fourth: The Party of the Second Part hereby further covenants and agrees that he will not for a period of two (2) years next ensuing the termination date of his employment herein and hereby created (whether such termination be by the limitation of time for which this contract is made, or by his voluntarily leaving the employ of the Party of the First Part, or whether he is discharged from its employ with or without cause) directly or indirectly, or as officer, director, agent, servant or employee, engage in or be employed in any branch of the fur dressing or fur dyeing industry. This restraint, however, shall extend only to each of those States of the United States of America as are located East of the Meridian passing through St. Louis, Missouri, amongst which states is to be included the whole of Missouri. It is intended that the foregoing restriction shall be a severable one and shall apply separately and distinctly to each of the states located East of the said Meridian with the same force and effect as though each of said states were here designated by name and said covenants separately expressed with respect to each of such states. The Party of the Second Part declares that the said territorial limitation is reasonable and prop-

erly required for the adequate protection of the business of the Party of the First Part. If a court of competent jurisdiction should declare this paragraph wholly or partially void, the remaining portions of this agreement shall nevertheless remain valid."

2. "Eighth: Notwithstanding any provision in this agreement which may conflict with such right, the employer herein shall have the right to suspend at any and all times and from time to time the performance by the employee of the latter's active duties hereunder. Such suspension shall not constitute a breach on the part of the employer and shall not relieve the employee from any promise, undertaking, or restriction herein expressed or assumed by him, except that of active daily work. Any such suspension may be terminated upon one week's notice to the employee, after which week the employee shall resume and perform his duties hereunder as though such suspension had not occurred. During each period of suspension, the salary herein stipulated shall not be abated or reduced to any extent whatsoever. During such periods of suspension the employee shall not engage in any business or commercial enterprise of any kind or description."

engaging in the industry and to deny the public the advantage of competition and the talent, skill and experience of the plaintiff.

That there are many branches of the fur dressing and dyeing industry in which some companies devote themselves exclusively to the dressing or dyeing of a given fur, others to dressing and dyeing processes where those are inseparable and still others are engaged solely in striping furs which are dyed by others and substantially no processor engages at any time in the dressing and dyeing of all of the dozens of furs in commercial use; that competition among processors consists essentially of producing new shades or colors of furs.

That the formulae and processes utilized by plaintiff in his employment by defendant were his own, acquired by him prior to said employment, and that other processes which plaintiff sought to develop during employment with defendant were commercially unsound and conceded to be so by the defendant; that at no time did defendant entrust plaintiff with any formula or process or any business methods which were of a nature which would require or justify the exaction of any restriction with respect to competitive activities after the termination of the term of their contract and that in any event the restriction contained in the fourth paragraph of the contract is unreasonably broad since it relates to all of the branches of the industry and for the reason that no information with respect to rabbit could be used competitively against defendant in other branches of the industry.

That on or about September 5, 1945, defendant instituted against plaintiff, Imperial Fur Blending Corporation, Richard Villani (now deceased), and Robert Caruba, an action in the Court of Chancery in the State of New Jersey seeking to enforce the restrictive provisions of the said contract both by way of injunctive relief and the recovery of damages.

That on November 24, 1945 the defendant obtained a temporary injunction in said proceedings restraining plaintiff from continuing his then employment with the co-defendant in the said action, Imperial Fur Blending Corporation, which restraint continued in effect until the expiration of Paragraph "Fourth" of the contract, to wit, December 31, 1946. That those proceedings were instituted and are being maintained by the defendant herein in furtherance of the the illegal purpose denounced by said acts of Congress; that after trial the complaint filed in the State court was dismissed by the trial court on the ground that the defendant was guilty of unclean hands, but on appeal to the Supreme Court of New Jersey the judgment was reversed and the cause remanded. A. Hollander & Son, Inc., v. Imperial Fur Blending Corp., 2 N.J. 235, 66 A. 2d 319. That the opinion of the Supreme Court of New Jersey provides that the plaintiff herein account for the sum of $150 per week, received in salary from January 1, 1943 to December 31, 1944, and that the several defendants in the said state action account for profits made by them as a result of operations conducted in violation of said restrictive covenant. That the defendant is about to enter an order or judgment in the trial court pursuant to the mandate of the appellate court and to proceed with an accounting.

That the Court of Chancery of New Jersey was without jurisdiction to entertain the causes of action alleged in this complaint and they were not submitted to said court for adjudication.

That the defendant is the largest processor of furs in the industry in the United States and occupies a preeminent position in the field dominating the industry and doing about thirty percent of all the fur processing work in the country monopolizing and attempting to monopolize the industry within the meaning of the acts of Congress; that it has exacted and exacts from all of its dyers and other key personnel, contracts in the same form and substance as the one of which plaintiff complains and that they are intended by defendant as a means and method whereby the defendant forecloses skillful and talented dyers in its employ from leaving their employment and entering into competition with defendant; that plaintiff has been and will be injured in his business and in his property by reason of defendant's acts as follows: (a) loss of income and

earnings which the plaintiff would have been able to obtain from January 1, 1943 through December 31, 1946 by engaging as an independent processor and by obtaining employment in the industry, (b) loss of opportunity to reestablish himself properly in the industry to capitalize upon his standing in the industry and to enhance his skill and experience by participating actively in processing work, (c) damage by reason of any recovery which the defendant herein may obtain against the plaintiff in the stated action described above and to the extent of any such recovery, (d) loss by reason of expenses and obligations incurred by plaintiff in defense of said litigation in the said court.

Thereby plaintiff claims he has been damaged to the extent of $150,000 which he seeks to recover three-fold, plus the cost of suit, including a reasonable amount for attorneys' fees.

Plaintiff includes a second count in his complaint in which he repeats the allegations of the first count and alleges further that the continuance of the litigation in the State court and the enforcement of any judgment therein against him or his co-defendants will result in further injury to the plaintiff in his business and property, in violation of the acts of Congress; that defendant has threatened to sue all who use the processes of the Imperial Fur Blending Corporation or handle products so processed by that company, and the institution of any such action would grievously injure plaintiff in his business and property by impairing his standing in the industry and the good will which plaintiff has established among users of processing services so plaintiff demands judgment against defendant:

(1) Determining and adjudging that the same contract and the provisions thereof and the said monopoly and attempted monopoly therein above described are illegal and violative of the Acts of Congress referred to in the complaint;

(2) Permanently restraining and enjoining the defendant from proceeding with litigation in the courts of the State of New Jersey, as described in the complaint;

(3) Compelling the defendant to cancel of record any judgment which the defendant has or may hereafter recover in the State court proceedings against the plaintiff and the co-defendants in the state action upon the basis of said contract and requiring this defendant to make restitution to plaintiff and the other defendants in the State court proceedings with respect to any sums which defendant herein may collect under any judgment, and,

(4) Permanently restraining and enjoining the defendant from instituting any further proceedings in any tribunal against the plaintiff or any one else seeking to enforce the said contract or to obtain any recovery thereon.

The defendant attacked the complaint by way of a motion for summary judgment pursuant to Rules 56(b)[3] and 12(b)[4] of the

3. "A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof."

4. "Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter, (2) lack of jurisdiction over the person, (3) improper venue, (4) insufficiency of process, (5) insufficiency of service of process, (6) failure to state a claim upon which relief can be granted, (7) failure to join an indispensable party. A motion making any of these defenses shall be made before pleading if a further pleading is permitted. No defense or objection is waived by being joined with one or more other defenses or objections in a responsive pleading or motion. If a pleading sets forth a claim for relief to which the adverse party is not required to serve a responsive pleading, he may assert at the trial any defense in law or fact to that claim for relief. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion

Rules of Civil Procedure, 28 U.S.C., on the general ground that the complaint fails to state a claim upon which relief can be granted. Specifically, the defendant's arguments are based on the following points:

(1) The covenant here involved being in reasonable restraint of trade is not therefore violative of the anti-trust acts of Congress.

(2) The action is barred by principles of res adjudicata.

(3) Plaintiff is otherwise estopped from maintaining the action by reason (a) unclean hands, (b) he is in pari delicto, (c) laches and (d) plaintiff was not damaged.

(4) Plaintiff's cause is barred by the statute of limitations.

(5) No monopoly is involved.

(6) The complaint sets forth no cause of action.

Plaintiff countered with his own motion for summary judgment arguing that the contract herein involved is illegal under the anti-trust laws, that the State court proceedings in no wise preclude this court from the exercise of its jurisdiction and that this court has the power to enjoin the State court proceedings.

Both motions were argued upon voluminous affidavits, briefs and reply briefs filed by the parties. There seems to be no doubt that the controversy is disposable under the motions for summary judgment. For the most part there are no material issues of fact. Where conflicts seems to appear analysis discloses that either they were determined by the New Jersey courts or are of so little materiality or substance as to make further hearings upon them superfluous. Indeed, the record reveals rather clearly that the problem here is essentially one of applying legal standards to circumstances adequately before the court.

It appears that the plaintiff is a resident of New Jersey and that defendant is a corporation of the State of Delaware, authorized to do business in New Jersey. From the age of 14 years plaintiff has been engaged in the fur dressing and dyeing industry. He is a grandson of Adolph Hollander, a founder of the defendant company, and his uncles, Ben, Albert and the late Michael Hollander, were the principal parties in interest in it at the time of the contractual relationship which is the subject of this suit. From 1921 to 1939 he was self-employed in the industry, engaged either individually or through corporations in which he had a proprietory interest and achieved a high standing in it as a skilled and talented dyer of various furs. In 1939 the corporation in which he and his brother were co-owners failed and he sought employment in the defendant company by way of a proposal couched in the following language:

"Newark, N. J.,
November 2, 1939

"Mr. Michael Hollander,

"% A. Hollander & Son, Inc.,

"Newark, N. J.

"Dear Sir:

"On Monday of this week I suggested to Al. Feldman that your company reopen the Long Branch plant. The conversation only covered the subject in a general way. Feldman called me on the telephone later in the day, and mentioned, that the suggestion I made 'in principle was acceptable.' It was decided that I submit a brief written outline of the proposal directly to you.

"*Purpose*

"Under this proposal the Long Branch plant, would be devoted exclusively, to the dressing and dyeing of rabbitskins seal. Specialization has its advantages from both a technical and economical point of view. Sponsored by A. H. & S. this venture, with a product of substantial merit, would I am sure, within a comparatively short space of time reach a commanding position in the trade.

shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."

"Product

"The most important element in making this proposal profitable is, of course, the product. Today we are producing a seal-dyed rabbit that would meet every requirement you would demand. It is also important to know that the element of risk has, from a producing point of view, been almost entirely eliminated. This refers to damage allowances. I could go into a lengthy discussion on this subject, and would be very pleased to if you so request. It is my suggestion that 'two brands' should be established, one brand to provide for the volume business, and volume business is essential, and the other brand to provide for the so called better skin or buck. No attempt should be made to regulate the quality of the merchandise. The differential in price would do all the regulating we would require. After all our job is to do the dressing and dyeing and avoid all theories of merchandising. * * *

 * * * * * *

"Prices

"The volume brand should be able to command a price of 17¢ for dressing and dyeing. Under your sponsorship the better brand could be figured from 23¢ to 25¢.

"Indirect Charges

"This is without question a very important item and should be placed on a very strict budget. * * *

"Profits

"Estimating profits is always hazardous. From our own experience three million skins a year is not too much to expect. It is a conservative estimate. Proceeding on this basis the following will give a fairly accurate idea of what can be anticipated:

| | | |
|---|---|---|
| *Average Selling price | 17.5 | |
| **Average Direct Cost | 12.0 | |
| Gross Profit per skin | 5.5 | |
| Gross Profit-three million | | 165,000.00 |

" *The average selling price of 17.5¢ is conservative. Under your sponsorship, it should be 10% higher.

" **This cost includes every conceivable direct charge, and is based on a labor situation similar to our present experience, although I feel labor would be somewhat cheaper in Long Branch than in Newark.

" ***No provision was made here, for depreciation. Our own experience with losses due to bad debts has been negligible, less than the amount provided here.

***Deduct:

| | |
|---|---|
| Indirect Charges | $60,000.00 |
| Reserve for Bad Debts | $ 5,250.00 |
| Reserve for allowances | $ 5,250.00 |
| Total Deductions | 70,500.00 |

"Net Profit $ 94,500.00

"Management

"My recommendation is that a venture of this character be directed by one person responsible only to the President of the parent company or its Board of Directors. This method is simple, practical, and efficient.

"Corporate Organization

"It may be advisable to organize a subsidiary company * * *."

"Capital

"It is assumed that the Long Branch plant is completely equipped for the type of work referred to in this proposal. * * *

 * * * * * *

"Summary

"Sponsored by A. H. & S., this venture has every opportunity to succeed. It must be considered that the indirect charges would not expand with additional volume, and a greater volume than three million rabbitskins a year is very likely. * * *

"This outline may be somewhat inadequate, but it does contain some essential facts, sufficient, perhaps, to help you in arriving at a decision."

 "Very truly yours,
 "/s/ Philip A. Singer."

The proposal was accepted by Hollander on the basis of a salary of $150 per week and Singer hired help and installed all of the procedures for processing rabbit fur in the plant at Long Branch, New Jersey.

The following February defendant Hollander presented the contract referred to in the complaint to Singer. He asserts that, at first, he demurred and would not sign it but subsequently in the spring or early summer of 1940 he executed it under

the assurance of the president of the defendant company that he need not concern himself with the restrictive provisions contained therein. He deposed that at the time of the execution of the said agreement he was economically unable to resist the pressure brought upon him to enter into the agreement by reason of the difficult financial condition in which he then found himself and his acute need for gainful employment.

Then in the summer of 1942 differences had arisen between Hollander and Singer with respect to the operation conducted by him in its plant. The plant was substantially inactive. Singer says he sought a release from the contract but Hollander refused to release him and on or about January 1, 1943 placed him in a state of suspension under the provisions of Paragraph "Eighth" of the contract in which state he was continued until the terminal date fixed in the contract, December 31, 1944.

The activities of Singer and others associated with him in connection with the contract here in suit were described in the opinion of Vice Chancellor Berry, filed August 21, 1948 in the then Court of Chancery of New Jersey, in the case of A. Hollander & Son, Inc., v. Imperial Fur Blending Corporation et al., 148/576 (not reported), and in the opinion of Justice Wachenfeld disposing of the appeal and cross-appeals from the latter decision, wherein he spoke for the New Jersey Supreme Court, in A. Hollander & Son, Inc., v. Imperial Fur Blending Corporation, 2 N.J. 235, 66 A.2d 319, 327.[5]

The opinions have distinctive continuity, for that of the Supreme Court of New Jersey specifically holds that the "findings of fact made by the Vice Chancellor and incorporated in the final decree are affirmed." (which in turn incorporated by reference each and every fact found in the opinion) although the Vice Chancellor's judgment denying relief to the appellant

A. Hollander & Son, Inc., defendant in this suit, was reversed.

The Vice Chancellor found that the plaintiff in this suit, Philip A. Singer, in the course of his employment by the defendant herein, Hollander & Son, under the contract between them, which is the basis of the dispute here, was installed as manager of Hollander's Long Branch, New Jersey plant which had been closed for some time. There he was entrusted with Hollander's master formulae and current formulae books which were kept in a safe in the Long Branch plant. Singer remained in charge of the plant until January 1, 1943, when he was suspended from active duty, pursuant to the provisions of Paragraph "Eighth" of the contract of employment. The business under his management was unsuccessful.

In August of 1942 he began promoting a rival business which eventually became the Imperial Fur Blending Corporation. He organized this enterprise with former associates, Richard Villani, employed with him in the Long Branch plant of Hollander's and Robert Caruba, whom he had employed as an accountant before the bankruptcy of his former business. Singer attempted to induce Louis Hollander, an employee of Hollander's, to join him prior to his suspension, as well as Charles Russell, afterward, another of Hollander's employees, to go into business with him. The offer was made to Russell after he took over the conduct of the Long Branch plant upon Singer's suspension. It was noted by the Vice Chancellor that for two years after Russell took over, the Long Branch business experienced successful operation and considerable profit. He also found that profits made by Imperial Fur Blending Corporation within the scope of the time limitations of the Singer employment contract were the result of Singer's developments and that a salary of $15,000 for two years, which he drew from Hollander, subsequent to his suspension and while he was engaged

5. Incidental to this suit was the litigation in which one of Singer's co-defendants was found guilty of criminal contempt because testimony he gave was perjured. In re Caruba, 139 N.J.Eq. 404, 51 A.2d 446, affirmed 140 N.J.Eq. 563, 55 A.2d 289; certiorari denied 335. U.S. 846, 69 S.Ct. 69, 93 L.Ed. 396, and In re Caruba, 142 N.J.Eq. 358, 61 A.2d 290.

behind the facade of Imperial, was illegally and fraudulently collected. He also found that if Hollander were entitled to an accounting it would include both items of profits and salary during the suspension period. But the Vice Chancellor held that Hollander had forfeited its right to any relief in the suit and must suffer dismissal of its complaint because it had soiled its hands during the pendency of the suit before him by publishing an advertisement in a trade journal which he held constituted unfair competition and a contempt of the court.

On the appeals from the Vice Chancellor's decision the Supreme Court of New Jersey, in its opinion, above cited, took a less rigid view of the advertisement and held that the circumstances under which the publication was made were not such as to warrant the application of the doctrine of unclean hands so as to bar the relief sought. Again it recounted in detail the early relationships of Singer and Hollander; the consummation of the employment contract and the subterfuge by which Singer in 1942 organized the beginnings of the competitive business with Villani and Caruba, which later became known as Imperial, and that finally in 1945 Singer became openly associated with it until a few days after the expiration of the restrictive covenant in the employment contract on December 31, 1946, when the name Imperial disappeared to be replaced by signs on the business locations reading: "Philip A. Singer, Inc."

The Supreme Court of New Jersey found that Hollander had established its right to injunctive relief and an accounting of the profits made by the respondent including the determination that Singer was not entitled to retain the salary of $15,000 paid to him during his suspension.

Although there has been inevitably injected into the proceedings in this case much of the record before the State courts, this court may obviously not be constituted an appellate tribunal to review questions passed upon by the highest court of the State of New Jersey, and the plaintiff if he is to succeed here, must do so upon the theory that he has shown that the defendant has victimized him by dealing with him in violation of the anti-trust laws.

We therefore come to the immediate issue underlying this case, which is: Is the contract here involved illegal under the anti-trust laws?[6]

The plaintiff stoutly maintains that the answer to this question is an emphatic yes. He acknowledges that a basic interpretation of the impact of restrictive covenants against the anti-trust laws is to be found in the commentary of the court in the case of United States v. Addyston Pipe & Steel Co., 6 Cir., 1898, 85 F. 271 wherein the court declared that if the contract of association which bound parties was void and unenforceable at common law because in restraint of trade it is within the inhibition of the anti-trust laws if the trade it restrained was interstate.

At page 281 of 85 F., the Court classified contracts, including employment agreements, although in partial restraint of trade, as generally upheld as valid, under conditions as set forth as follows:

"For the reasons given, then, covenants in partial restraint of trade are generally upheld as valid when they are agreements * * * to protection from the danger of loss to the employer's business caused by the unjust use on the part of the employe of the confidential knowledge acquired in such business. * * *

"It would be stating it too strongly

6. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *." 15 U.S.C.A. § 1.

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15.

to say that these five classes of covenants in restraint of trade include all of those upheld as valid at the common law; but it would certainly seem to follow from the tests laid down for determining the validity of such an agreement that no conventional restraint of trade can be enforced unless the covenant embodying it is merely ancillary to the main purpose of a lawful contract, and necessary to protect the covenantee in the enjoyment of the legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other * * *."

From this and the cases of Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; Gardella v. Chandler, 2 Cir., 1949, 172 F.2d 402; Martin v. National League Baseball Club, 2 Cir., 1949, 174 F.2d 917, and other authorities he concludes that the "Eighth" and "Fourth" paragraphs are illegal under the common law and since interstate commerce is affected in his contract even though the New Jersey courts have ruled the restraints in said paragraphs to be valid, such determination is not binding upon the federal court in an action to apply the sanctions of the anti-trust laws.

Singer concedes that the "Eighth" paragraph of the employment contract could have been legal in certain circumstances such as to give aid to a covenant to work, as it is ordinarily utilized, where the employee has some unique quality of service for which there is no equivalent as for example, a theatrical entertainer. In this way it is a device to accomplish the enforcement of the contract by giving the employee the choice of performing his service for his employer under the contract or remaining idle in the particular field of the employment contract. Lumley v. Wagner, 1 G.M. and G. 604, 42 Eng.Rep. 687. But he argues here that he was prevented from working for his employer and for anyone else in any field, and that the purpose of the "Eighth" paragraph in his case was to eliminate his competition and to enforce him to live in complete idleness not tolerated by the law as a subject for contractual negotiation.

Singer likewise contends that the "Fourth" paragraph which he identifies as the post-employment restrictive covenant is also illegal. He argues that a post-employment restrictive covenant may be exacted only where the employee in his employment acquires secret or confidential information. He contends that in this case the plaintiff did not acquire any such secret or confidential information, and if he did, against his fund of knowledge such secrets were relatively minor and not sufficient to justify a restraint. In any event he asserts that the restraint was too broad in that by it he was enjoined from engaging in the entire fur processing industry rather than in a single branch—the rabbit branch —the only field in which Singer claims Hollander was operating. In other words, plaintiff claims the defendant did not entrust him with any confidential or secret matters, and that under such circumstances no valid covenant could be exacted from him restraining him from pursuing the field of the contract. Singer takes the position that regardless of the decisions of the New Jersey courts in this respect, which he declares have no binding effect on this court in this case, the intended and actual effect of the restraints in the contract here were to inhibit the plaintiff from exercising his art or profession and that this resulted in limiting the supply of fur processing services entering into interstate commerce and thereby there was a violation of the anti-trust laws.

■ I am not willing to hold, as Hollander would have me, that because Singer did not raise illegality under the ant-trust laws defensively in the State court suit that he is estopped from bringing this action. Nor will I accept its proposition that since the same contract and identical restrictive covenants as between the same parties were litigated in the State court suit that the doctrine of res adjudicata compels the disposition of this case favorably to it. If, as Singer argues, the contract although ruled valid by the decision of the State court, when viewed in the light of the

anti-trust laws here can be said to be violative of them, he is entitled to the remedies provided in those laws.

■ However, the rulings of the highest court of New Jersey on questions of law and fact which were litigated before it between these parties will be regarded as conclusive upon Singer upon the issues they purport to decide.

The alleged invalidity of the restraints contained in the "Eighth" and "Fourth" paragraphs of the employment contract was considered by the Supreme Court of New Jersey. Essentially the same arguments were made there as here as to the alleged fatal weakness of the "Eighth" paragraph ascribed to the voluntary idleness to which it exposed an employee. As to that the court said:

"The purpose of the clause is to protect Hollander from an employee it suspects but cannot prove is violating the portions of the agreement protecting trade methods and secrets. Considering the nature of the employer's business, the secrecy of its formulae and processes and the broad supervisory duties of Singer, it cannot be said the clause was an unreasonable restriction for the protection of the employer's business. On the other hand, Singer is not deprived of a livelihood but specifically receives his usual compensation during the period of suspension. His position as to its financial return is the same as if he were allowed to pursue his usual duties. Under the circumstances, the suspension provision cannot be deemed unlawful." 2 N.J. at page 250, 66 A.2d at page 326.

Again, when the legality of the "Fourth" paragraph was attacked, the court held as follows:

"Covenants against post-employment competition receive judicial sanction where the prohibition is reasonably necessary for the protection of the business of the employer, is not unreasonably restrictive in point of time or territory upon the rights of the employee, and is not prejudicial to the public interests. Sarco Co. of N. J. v. Gulliver, 129 A. 399, 3 N.J.Misc. 641 (Ch.1925), affirmed, 99 N.J.Eq. 432, 131 A. 923 (E. & A.1926); Ideal Laundry Co. v. Gugliemone, 107 N.J.Eq. 108, 151 A. 617 (E. & A.1930); Original N. Y. Furriers Co. v. Williams, 133 N.J. Eq. 524, 33 A.2d 292 (Ch.1943); Irvington Varnish & Insulator Co. v. Van Norde, 138 N.J.Eq. 99, 46 A.2d 201 (E. & A.1946); Silbros, Inc., v. Solomon, 139 N.J.Eq. 528, 52 A.2d 534 (Ch. 1947).

"The validity of the covenant is not predicated on methods or processes secret in fact and revealed to the employee in confidence but rests on the protection afforded an employer against disclosure of business and industrial methods and processes used, records compiled and customer contacts made in the employment. Kislak, [Inc.] v. Muller, 100 N.J.Eq. 110, 135 A. 673 (Ch.1926); Ideal Laundry Co. v. Gugliemone, supra; Credit Rating Service, Inc., v. Charlesworth, 126 N.J.Eq. 360, 8 A.2d 847 (Ch.1939); Irvington Varnish & Insulator Co. v. Van Norde, supra; Pilgrim Coat, Apron & Linen Service, Inc., v. Krzywulak, 141 N.J. Eq. 212, 56 A.2d 584 (Ch.1948).

"The fact that the employee's services are not of a kind requiring unique skill and ability is immaterial as the main problem is the reasonable protection to the employer against competition by the employee who has received consideration for the covenant. Sarco Co. of N. J. v. Gulliver, supra; Vander May v. Schoone-Jongen, 128 N.J.Eq. 336, 16 A.2d 198 (Ch.1940). Where the employee through his employment has learned of the business practices and methods of his employer which if disclosed to a competitor may result in irreparable injury to the complainant, the court may presume irreparable injury will ensue from the breach of the covenant. Ideal Laundry Co. v. Gugliemone, supra; Capital Laundry Co. v. Vannozzi, 115 N.J.Eq. 26, 169 A. 554 (Ch.1933); Credit Rating Service, Inc. v. Charlesworth, supra.

"Although previous to the association with Hollander Singer admittedly was highly skilled, during the employment he was placed in a special position to learn the various secret formulae and processing methods of Hollander. Through possession of the formula books and supervision of the dye house, he became intimately acquainted with and fully cognizant of the very core of Hollander's successful operations. This information was of substantial value and of such vital importance as to warrant the company in taking the greatest precautions in attempting to fashion a cloak of ample protection. In addition, Singer's discovery of a new dye formula, which under the employment agreement became the property of Hollander, was clearly in the category of a business secret. It was that formula which was extensively used by Imperial in competing with Hollander." 2 N.J. at pages 248, 249, 66 A.2d at page 325.

Singer's related contention that the restriction upon him in any event was too broad when it went beyond the rabbit fur processing field was also treated by the Supreme Court of New Jersey in the following language:

"While it is admitted the covenant not to compete is reasonable as to time and territory, the contention is made the covenant is too broad since it bars Singer from engaging 'in any branch of the fur dressing or fur dyeing industry.' To restrict the validity of the covenant to a particular fur process or sphere of activity of the business, as contended would in part or completely nullify its effectiveness. The work done by Hollander changed with varying styles and the general supervisory nature of Singer's employment provided ample justification for the broad scope of the covenant. Similarly broad restrictions have already either expressly or impliedly been upheld despite employment of a much narrower scope. Sternberg v. O'Brien, 48 N.J.Eq. 370, 22 A. 348 (Ch.1891); Owl Laundry Co. v. Banks, 83 N.J.Eq. 230, 89 A. 1055 (Ch.1914); Kislak v. Muller, supra; A. Fink & Sons v. Goldberg, 101 N.J.Eq. 644, 139 A. 408 (Ch.1927); Ideal Laundry Co. v. Gugliemone, supra; Capital Laundry Co. v. Vannozzi, supra; Irvington Varnish & Insulator Co. v. Van Norde, supra." 2 N.J. at pages 249, 250, 66 A.2d at page 326.

In this connection Singer quarrels with the case of Irvington Varnish and Insulator Co. v. Van Norde, 138 N.J.Eq. 99, 46 A.2d 201 as having overturned the settled law of New Jersey and that it now has established the rule, in his opinion, that the "naked fact of employment suffices to restrain a post employment restraint so long as there is any business method involved." This again was a decision of the Court of Errors and Appeals of New Jersey (in 1946) and I cannot agree with the strained construction he places upon it or which he places on the decision of the Supreme Court of New Jersey in his case. I do not find the inconsistencies or confusions attributed by Singer to the findings of the Supreme Court of New Jersey. To me they are reasonable, logical and persuasive dispositions of the issues presented and in any event are conclusive of the questions of fact and law they settle and are binding upon him.

The contract did not provide for Singer's idleness as such. It is not in the pattern of the instance he suggests where the proprietor of an existing business goes to one proposing to establish a competing business and seeks to pay him not to invade his field with competition. On the contrary, it was a contract for work upon the part of Singer in which he pledged himself in the "Second" and "Third" paragraphs of his contract as follows:

"Second: The party of the Second Part hereby accepts the said employment upon the terms and conditions in this agreement stated, and agrees that he will devote for and during the period thereof his entire time, skill and attention to the service of the Party of the First Part [Hollander] and all of its branches and subsidiary corporations and that he will at all times faithfully, honestly, honorably and efficiently execute and perform the duties that

may be assigned to him by the Party of the First Part or its Board of Directors or any of its officers for that purpose designated by the Board, to the best of his skill, understanding and ability; and that he will always hold secret and inviolate all the trade secrets and fur dressing and dyeing formulae, processes, recipes and working methods owned, used and/or employed by the Party of the First Part, and all of its present and future branches and subsidiary corporations, and will also hold secret and inviolate all experiments in whole or in part, engaged in for discovering fur dressing and dyeing formulae, recipes, processes and working methods; and that he will not, at any time, either during the period of employment hereby created or at any time thereafter, directly or indirectly divulge to any person, firm or corporation (except to the Party of the First Part and its officers), any information acquired by him while in the employ of the Party of the First Part or its predecessor (A. Hollander & Son, a co-partnership) or any of its subsidiary corporations, or that may be acquired by him during the employment hereby created, relating to or regarding any processes, recipes, formulae or methods now or heretofore used in the factories of the Party of the First Part (or its said predecessor) or any of its subsidiaries or now or hereafter used in any of the plants or factories of the Party of the First Part or any of its subsidiary corporations, in the dressing of fur skins, or regarding the compounding or application of any dyestuffs or chemicals used in the process of dyeing fur skins, all of which processes, formulae, recipes, methods, compounds or applications, now are or hereafter and during this employment used in any of the factories of the Party of the First Part or any of the subsidiary companies of the Party of the First Part, are hereby declared to be the secret and exclusive property of the Party of the First Part. The Party of the Second Part [Singer] agrees that he will, for all time hereafter, hold inviolate the treatments, processes, recipes, formulae, methods, compounds and applications of dyestuffs and chemicals and the trade secrets in the dressing and dyeing of fur skins, acquired by him or used by him while in the employ of the said Party of the First Part, its predecessor or subsidiaries. The Party of the Second Part further agrees that he will at no time, either during this employment or at any time thereafter, employ or make use of, for his own profit or for the profit of any person, firm or corporation other than the Party of the First Part, any of said trade secrets acquired by him as aforesaid, or any of the processes, recipes, formulae, methods, treatments or applications entrusted unto or acquired by him during his employment by the Party of the First Part or its predecessor or any of its subsidiaries.

"The Party of the Second Part further agrees that if during the term of this contract or any of the renewal periods thereof he experiments and discovers any new shade or shades of color or combinations of chemicals and dyes, or any new formulae, recipes, processes, and/or working methods to be used in the dressing and/or dyeing of fur skins or pelts, the said discovery shall be for the sole property of the Party of the First Part and for the sole use and benefit of the Party of the First Part, its various branches and subsidiary corporations and the Party of the Second Part will turn over the accurate recipes, formulae, processes or working methods to the Party of the First Part whose property they shall be and always remain. The Party of the Second Part will not disclose to any person or persons other than the proper officers of the Party of the First Part any formulae, recipes, processes or working methods discovered by him while in the employ of the Party of the First Part, nor will he inform any person or persons (other than the officers of the Party of the First Part) of the experiments that he is making

or conducting during the period of his employment. The foregoing provision shall be applicable even though the discovery be made by the employee outside of working hours fixed by the employer and outside of the place of employment furnished by the employer."

"Third: The Party of the Second Part further covenants and agrees that during the term of employment herein and hereby created, he will serve the party of the First Part and its branches and subsidiary corporations, in the aforesaid capacity, to the exclusion of all other persons, firms, or corporations, and that he will not, during said period, directly, or indirectly, engage in any other business, occupation or enterprise."

Of his adherence to these obligations the Supreme Court of New Jersey said this:

"The record establishes beyond doubt Singer's infidelity to Hollander through failure to serve faithfully and exclusively; divulgence of trade secrets to Imperial Corporation, specifically organized by him to compete with Hollander during the period of employment; granting to Imperial of formulae developed by him; and active competition against Hollander subsequent to discharge, all in violation of the express provisions of the employment contract. Under the contract he was to be loyal, faithful and dependable, but the record conclusively shows him to have been subtle, false and treacherous. Breach of the employment contract by Singer is clear and unequivocal and his conspiracy with the other respondents to profit from the trade secrets and formulae of the appellant is fully and firmly established." 2 N.J. at page 245, 66 A.2d at page 323.

Singer attempts to fortify his position that Hollander had violated the antitrust laws by the execution of the contract of employment with him by asserting that Hollander monopolizes the fur processing industry, having secured its dominant position therein in part by extensive advertising and that it forecloses skillful and talented dyers in its employ from leaving their employment and entering into competition with it by means of exacting contracts from them similar to the one in suit here. (Complaint, par. 18.) He estimates that it is one of 48 or 68 firms in the country which either dress, dye, blend or stripe furs (or perform one or more or all of these processing services), that it employs 40 percent of the workers in the industry and does 30 percent of the work of it.

Hollander says that at the time of the making of the contract it was one of 250 such concerns in the country doing about 10 percent of the dollar volume of the industry, conceding that this made it the largest single concern in the industry and one of the leading fur dressing and dyeing firms in the country and perhaps in the world. Of its 1500 employees, 31 are under contracts concededly containing restraints similar to those imposed in Singer's, that a large number of such employees, like Singer, are related in one way or another to the founding family; and that there is keen competition between it and all fur processors which keeps prices within a reasonable range. (Affidavit of Feldman on motion.)

Singer himself, comments on competition in the industry in his affidavit, as follows:

"The primary effect of such restrictions is to deprive the public of the new shades of furs and the effect upon prices necessarily follows. It is true, as I have said, that no one could compete with Hollander on an equal product even with a price differential, but a new shade or superior product can eliminate even Hollander out of a given branch of the industry. Hence, by restrictions which prevent the development and introduction of new shades into the market, Hollander is enabled to sell inferior products at a price in excess of what it is really worth to the public. Moreover, when another processor either captures entirely or makes an appreciable inroad

into one branch of the industry with a new shade or superior product and offers that production at a lesser price than Hollander charges, which is what usually happens, it necessarily follows that Hollander would have to reduce its charge for an inferior product if indeed the Hollander product remains sufficiently in demand to permit Hollander to remain in that branch at all. Furthermore, when the Hollander Company undertakes to imitate the new shade thus introduced in competition, it obviously must gauge its price by the price charged by the processor who made that innovation. * * *

\* \* \* \* \* \*

"(i) The Imperial rabbit formula which the State Courts credited to me despite my disavowal captured the long-haired rabbit market. The company of which I am now president has a long-haired rabbit product which makes the product of the Imperial Company obsolete. The company now headed by me has a new shade on muskrat which has already made a tremendous inroad in a field heretofore dominated by the Hollander Company and I have no doubt that my company will dominate the muskrat field (other than Hudson seal) within a year. My company has a new marmot formula which we have been exploiting for three months and there is every indication that we will capture the marmot field within the next six months.

"(j) The Hollander Company still dominates the Hudson Seal Muskrat field 100% because no one as yet has been able to produce a superior fur in that particular branch. \* \* \*

" \* \* \* I repeatedly demonstrated my capacity to create new and su- perior shades and to eliminate even a company like Hollander from a given branch of the industry. It was to prevent recurrence of such competition that the Hollander Company foisted this contract upon me."

It is baseless to argue that the contract was devised to thwart competition between Hollander and Singer in interstate commerce. That Hollander had no motive for such purpose is clear. Singer, in fact, was an unlikely prospect in the way of a competitor at that time. Indeed, he had failed to successfully compete for his business was bankrupt. Singer sought out the employment with Hollander and although he is now disposed to suggest that he subsequently demurred to the terms of the contract, the plain fact is that he executed it. He was no neophyte in the business world. His previous litigation [7] with Hollander indicates a knowledge of the ins and outs of commercial practices and he has expatiated in his affidavit of his lifelong exploits in the fur industry from the time he entered it as something of a child prodigy.

For one reason or another he was given employment by Hollander (the Vice Chancellor felt that it was a sympathetic one) whose experience with him theretofore was to say the least not pleasant. Nevertheless, he was taken on and given full charge of the production end of a branch of the business. At first he seemed filled with enthusiasm for his new association, as his own letter of proposal discloses, but this evidently waned for within three years after he had entered upon his employment the administration of his employer's affairs was more notable for its failure than for its success. Was this because of his greater interest in the launching of the competitive enterprise which ultimately came to light?

---

7. As represented by the following suits: Philip A. Singer & Bro., Inc., v. A. Hollander & Son, Inc., 1929, 104 N.J.Eq. 352, 145 A. 621; A. Hollander & Son, Inc., v. Philip A. Singer et al., (unreported) Docketed in Chancery Clerk's Office 73/65 (1929); A. Hollander & Son, Inc., v. Philip A. Singer & Bro., Inc., 119 N. J.Eq. 52, 180 A. 671, affirmed, 1935, 120 N.J.Eq. 76, 183 A. 296; Philip A. Singer & Bro., Inc. v. A. Hollander & Son, Inc., United States District Court for District of New Jersey, L-5620 and E-5626, respectively, filed on May 7, 1936 and November 12, 1936.

In the illumination of hindsight it is easy to see why the restrictive covenants "Eighth" and "Fourth" were reasonably conceived as safeguards to any employment of Singer by Hollander, just as the State Court held them to be. The very events precipitated by Singer, his surreptitious organization of another business while his contract was in force and effect and while he was drawing his income from Hollander prove now that special protective devices were in order to frame the relationship of employer and employee in the contract and even then it resulted in fracture because, as is so often the case, it could not have transfused into it integrity greater than that possessed by the parties to it.

Singer piously attempts to give his case a public tinge by charging that other of Hollander's employees are likewise bound by similar contracts and that thereby the public is deprived of the full bloom of their individual creative genius. The color is translucent, however, and reveals him as more desirous of escaping the effects of the judgment against him than of vindicating the public welfare.

Assuming all of the allegations of Singer to be true concerning the size of Hollander's business, its extraction of contracts from its employees containing restrictive covenants, similiar to those in suit here, the alleged efforts of Hollander to persuade him to urge Imperial to leave Long Branch so that it could have to itself that particular field in which to exploit labor (after the contract had been breached)—these do not make out a case of violation of anti-trust laws in the contractual arrangements between them.

Ancillary to this undertaking by Singer, Hollander, it now turns out, wisely provided that it should have the right to divert Singer from his strategic position in its business structure if his good faith and fidelity came into question, by the use of the mechanism of the "Eighth" paragraph and to render him harmless to the business during the life of the contract and under the "Fourth" paragraph for a reasonable period after the contract had expired.

I do not agree with Singer that there was absent from his relationship with his employer the essential skill upon his part or that he was not in a position to learn the secrets of his employer's business, which would warrant the restrictive covenants here in question. Singer himself, protested in his affidavit (probably with some justification) that he was one of 12 to 15 men in the country who were competent to create new fur processes and whether or not he acquired secret formulae from records to which he at least could have had access during his incumbency, the fact remains that he undertook an obligation to conduct faithfully an important business venture for his employer. In it there was implicit a vesting of high confidence in him and a corresponding responsibility to act in his employer's interests in every aspect to make them successful, as faithfully as if he were operating the business for his own interests. With the background of which we have spoken the covenants would have been legal at common law, in our opinion, were legal when the contract was written and retained their legality in the face of the anti-trust laws, under the tests advanced by Singer himself, as contained in United States v. Addyston Pipe & Steel Co., supra, and Restatement of the Law of Contracts, § 515 et seq.

There is no ground for the charges in the complaint in this case that the restrictive provisions of which Singer complains were intended to operate or did operate to prevent or reduce competition as to the price to be paid for processing services or the introduction of new colors on furs of better quality thereby depriving the public of reduction in price of the processing service and of finished fur garments by reason of competition and the increase in the finished products by reason of the introduction of new colors of furs.

Therefore the motion of the defendant for a summary judgment in its favor will be granted and the like motions of the plaintiff will be denied.

An order for judgment should be submitted in conformity herewith.