A. HOLLANDER & SON, INC., COMPLAINANT-APPELLANT,
 v. IMPERIAL FUR BLENDING CORPORATION, PHILIP
 A. SINGER, RICHARD VILLANI AND ROBERT CARUBA,
 DEFENDANTS-RESPONDENTS.

Argued March 14, 1949—Decided May 16, 1949.

236

*Mr. Meyer E. Ruback (Mr. Joseph A. Weisman,* on the brief; *Messrs. Ruback & Albach,* attorneys) argued the cause for the appellant.

*Mr. Alton V. Evans* argued the cause for the respondents Imperial Fur Blending Corporation, Richard Villani and Robert Caruba.

*Mr. Joseph Weintraub (Messrs. McGlynn, Weintraub & Stein,* attorneys) argued the cause for the respondent Philip A. Singer.

The opinion of the court was delivered by

WACHENFELD, J. Appellant instituted suit to enforce the terms of an employment contract containing various restrictive covenants and to obtain redress for the use by respondents of its secret processes and formulae. The court below, on the merits of the case, found the contract valid and breached by the conduct of Singer, in which the other respondents participated, but dismissed the bill for the sole reason that shortly after filing, appellant had inserted an advertisement in a trade publication advising of the pendency of the suit and the possibility of action against all persons doing business with the respondent company. The relief to which the appellant was otherwise entitled, as ascertained by the court below, was therefore forfeited. Appeal is taken from the dismissal so made and there are cross-appeals challenging the finding of the court on the merits.

The Hollander Corporation and its predecessor, a Hollander family enterprise, have been engaged in the business of processing, dyeing and blending raw furs or skins for over fifty years, having treated every kind of fur except long-haired

furs such as fox and wolf, and claim to be the largest in the field. As to what furs were processed depended upon the then prevailing styles. Operating many plants besides the one in New Jersey and, until the past war, in foreign countries as well, it does business generally throughout the United States. Its processes and formulae were developed by experimentation or acquired by purchase and in many cases are secret and confidential.

The respondent Philip A. Singer is a grandson of the Hollander who originally established appellant's business and admittedly is a skilled dyer and dresser of furs. Prior to 1939 he owned and operated a fur dyeing and dressing business under the firm name of Philip A. Singer & Bro., Inc. During that period the appellant successfully instituted proceedings against the corporation for trade-mark infringement. *A. Hollander & Son, Inc., v. Philip A. Singer & Bro., Inc.,* 119 *N. J. Eq.* 52 (*Ch.* 1935); affirmed, 120 *N. J. Eq.* 76 (*E. & A.* 1936).

In 1939, after the Singer Company went bankrupt, he approached the appellant for work and was employed as a dresser and dyer of furs and as manager of the Long Branch plant, which had been closed for several years. The employment contract was made on February 10, 1940, for a term ending December 31, 1944, at an annual salary of $7,500.

In paragraph 2 of the agreement Singer covenanted that during the term of employment he would faithfully perform his duties and would not divulge to any person outside the corporation any of the trade secrets or processes and not use them for profit to himself or another. The employer was to be the sole owner of all experiments and discoveries by Singer of any shades of color, new formulae, processes and working methods used in the dressing and dyeing of fur skins, and such discoveries were to be turned over to the employer and not otherwise disclosed by the employee. This provision was made applicable and in effect even though the experiments were made by the employee outside of working hours fixed by the employer and outside of the place of employment furnished by the employer.

By the terms of paragraph 3 Singer agreed to serve the employer exclusively and not engage directly or indirectly in any other business during the term of employment.

Paragraph 4 contained a covenant that the employee, for a two-year period ensuing upon termination of employment, would not "directly or indirectly * * * engage in or be employed in any branch of the fur dressing or fur dyeing industry" in any state east of the meridian passing through St. Louis, Missouri, listed severally and separately, an area specifically declared to be "required for the adequate protection" of the employer's business.

In paragraph 8 the employer reserved the right, upon one week's notice, "to suspend at any time and from time to time the performance by the employee of the latter's active duties hereunder." The salary, however, was to continue during suspension and the employee was not to engage "in any business or commercial enterprise of any kind or description."

As manager of the Long Branch plant Singer was entrusted with the appellant's Master and Current Formulae books. He conducted the business of the plant at a loss. In 1942, two years after commencing the employment, Singer tried to persuade Louis Hollander, a dyer and dresser employed by the appellant, to join him in an attempt to buy out the Long Branch plant and to go into business there but the latter refused.

In December, 1942, he secretly organized a competing company, the Imperial Fur Blending Corporation, starting operations in March, 1943, in Long Branch to process furs. The stock in the corporation was distributed twenty-five per cent to Sol Hordoff, twenty-five per cent to Richard Villani and fifty per cent to Robert Caruba.

Villani, the president and manager of the plant, had formerly been superintendent of Singer's own plan but was not experienced as a dyer and dresser of furs. When Singer became manager of appellant's plant, he employed Villani, who was given access to the dye house and to the formulae books kept in Singer's possession. He was under Singer's tutelage and as a result Villani obtained sufficient technical knowledge

of the business to subsequently operate Imperial's plant. Singer kept in telephone communication with Villani but did not appear at Imperial's plant for fear of disclosing his interest in the competing company at the time he was on Hollander's payroll.

Caruba, a certified public accountant, had been similarly formerly employed by Singer as an accountant for his old firm and as a stockholder in Imperial was nothing more than the alter ego of Singer, who paid for the stock taken in Caruba's name. Control over the Hordoff stock was retained by Singer through an option to purchase whereby he obtained first right to acquire in the event of sale.

In January, 1943, Singer requested Hollander Corporation to release him from his contract, at the same time expressly denying any connection with Imperial. The request was turned down. Officers of the appellant corporation became suspicious of Singer's relationship with the newly formed Imperial Company and suspended him under the terms of the contract, placing Charles Russell, an experienced practical dyer, as manager of the plant. Russell asked Singer for the formulae books which he had removed from the plant but they were never returned. Singer tried to persuade Russell to enter the fur dyeing and dressing business with him but Russell declined. Upon the change of management the Long Branch plant operated at a profit.

Singer did not relinquish his control of the Imperial Company, as shown by the appearance of his notations on the company records. By various subterfuges, until he openly took over Imperial, he siphoned off funds of the company. In 1943 he developed a new shade of dyed fur which he did not disclose to the appellant but diverted to Imperial. This development proved to be far superior to that used by the appellant. In the same year, at the expense of Imperial, he traveled to Canada for the purpose of opening a branch plant there but the plan was discarded.

In February, 1944, the Hollander Corporation filed a bill against Singer and the Imperial Corporation but before hearing it was dismissed without prejudice on complainant's mo-

tion. A year later Singer was openly employed by Imperial as a sales manager of its New York office, receiving weekly payment in cash to avoid withholding and social security taxes and to prevent suit by Hollander. In August, 1945, the Hordoff stock was purchased by Imperial, the deal being negotiated by Singer, and the following September 5th the present bill was filed. Charging breaches of the employment agreement, it sought an injunction against further violations until December 31, 1946, when the contract expired, and requested an accounting for the salaries paid to Singer during the suspension period amounting to $15,000 and profits made through the Imperial Corporation. The dissolution of the Imperial Corporation was also sought.

Three weeks after the commencement of this suit and before answer was filed, the Hollander Corporation inserted the following advertisement in a trade publication:

"AN IMPORTANT STATEMENT

"Women's Wear Daily reports the injunction proceedings filed by A. Hollander & Son, Inc., against Imperial Fur Blending Co., and others—alleging violation of contract and that a certain individual, 'while in the employ of Hollander, discovered new shades or color and combinations of chemicals and dyes and new formulas and processes for dressing and dyeing furs and—* * * diverted them to the benefit of Imperial Fur Blending Co.'

"The Women's Wear news item fails to mention paragraph 17 from the bill of complaint—a paragraph of vital import to all who may have done or may now be doing business with Imperial Fur Blending Co.

"That paragraph means—in plain non-legal language—that we may find it necessary to make a party to the suit all persons (dealers, manufacturers, department stores and retailers) who have done or are doing business with Imperial, with knowledge of the situation, and ask for an accounting by them of all profits made from the business relations with the Imperial Fur Blending Company.

"We believe it only fair to all to make this fact known.

"A. HOLLANDER & SON, INC.
"MICHAEL HOLLANDER,
"President."

On the day after the statement was published Imperial Company, Villani and Caruba, but not Singer, applied to the Vice-Chancellor for an order to restrain the appellant, pend-

ing determinaion of the cause, from publishing any statements pertaining to the suit. The request was denied and a motion for an order to show cause in contempt was made and similarly dismissed. However, the advertisement was not repeated and a preliminary injunction was granted to the appellant, in general restraining Singer from working for Imperial until further order, and hearings were held, being concluded on October 31, 1946. It appeared the books and records of Imperial had been in some instances destroyed and in others altered and mutilated. Certain of the testimony given by Caruba was found to be perjured. *In re Caruba,* 139 *N. J. Eq.* 404 (*Ch.* 1947); affirmed, 140 *N. J. Eq.* 563 (*E. & A.* 1947).

A few days after the expiration of the two-year restrictive covenant on December 31, 1946, the name of Imperial disappeared from its two plants in Long Branch and signs were posted on the buildings bearing the name of "Philip A. Singer, Inc." That fact was brought to the Vice-Chancellor's attention, who reopened the cause for further testimony before a master.

On August 21, 1948, the Vice-Chancellor found for the Hollander Company on the merits of the case, including that of conspiracy and piracy by respondents, but held the advertisement was "a bald attempt to intimidate the fur trade—the public—and to prejudice the public mind against the defendant Imperial Company before the cause was heard." Also finding the action constituted unfair competition and a contempt of court, he concluded the publication violated the clean hands doctrine and therefore dismissed the bill. Upon re-argument he did not change the decision, although he indicated the reason for not doing so was the futility thereof because of the imminence of the new judicial article going into effect on September 15th.

This appeal is from his conclusion and application of the clean hands doctrine, while the cross-appeals are from his finding on the merits of the case, assessment of the master's fee of $1,000 against respondents and the denial of costs and counsel fees.

The record establishes beyond doubt Singer's infidelity to Hollander through failure to serve faithfully and exclusively; divulgence of trade secrets to Imperial Corporation, specifically organized by him to compete with Hollander during the period of employment; granting to Imperial of formulae developed by him; and active competition against Hollander subsequent to discharge, all in violation of the express provisions of the employment contract. Under the contract he was to be loyal, faithful and dependable, but the record conclusively shows him to have been subtle, false and treacherous. Breach of the employment contract by Singer is clear and unequivocal and his conspiracy with the other respondents to profit from the trade secrets and formulae of the appellant is fully and firmly established.

Several contentions are made by the respondent to justify the dismissal of the bill upon the ground the conduct of appellant was so unconscionable that it has no standing or right to request the equitable relief sought. Reliance is made upon the equitable maxim that "He who comes into equity must come with clean hands," known as the "clean hands doctrine."

The only substantial basis for the application of the clean hands doctrine relates to the advertisement of September 26, 1945, in which appellant brought the attention of the public to the pendency of the suit and threatened to cause to account all persons who, knowing of the facts, dealt with Imperial. This the court below found was sufficient misconduct to warrant the dismissal of the bill, and the question is therefore posed whether such act was so unconscionable as to deprive the appellant of the relief to which it otherwise was entitled.

The publication of notice of trade-mark, patent or copyright infringement and the pendency of suit therefor has been held to be lawful even though acompanied with a threat to sue users who would be legally liable, provided the warnings are issued in good faith. *Chase v. Tuttle, 27 Fed.* 110 *(C. C. N. Y.* 1886) (patent) ; *Kelley v. Ypsilanti Dress-Stay Mfg. Co., 44 Fed.* 19 *(C. C. Mich.* 1890) (patent) ; *Computing Scale Co. v. National Computing Scale Co., 79 Fed.* 962

(*C. C. Ohio* 1897) (patent); *Warren Featherbone Co. v. Landauer*, 151 *Fed.* 130 (*C. C. Wis.* 1903) (trade-mark); *Mitchell v. International Tailoring Co.*, 169 *Fed.* 145 (*C. C. N. Y.* 1909) (patent); *Virtue v. Creamery Package Mfg. Co.*, 179 *Fed.* 115 (*C. C. A. 8th* 1910); affirmed 227 *U. S.* 8 (1913) (patent); *Celotex Co. v. Insulite Co.*, 39 *Fed.* 2d 213 (*D. C. Minn.* 1930) (patent); *Starns v. Success Portrait Co.*, 28 *Fed. Supp.* 711 (*D. C. Tenn.* 1939) (copyright); *Treemond Co. v. Schering Corp.*, 35 *Fed. Supp.* 475 (*D. C. N. J.* 1940) (patent); 1 *Callmann, Unfair Competition and Trade Marks* (1945), §§ 42.4 and 42.4(a).

In *Nims, Unfair Competition and Trade-Marks* (*4th ed.* 1947), § 267, the rule is stated as follows:

"CIRCULARS GIVING NOTICE OF PENDENCY OF SUIT FOR UNFAIR COMPETITION ARE LEGAL.

"A complainant in a suit for unfair competition or trade-mark, patent or copyright infringement may issue circulars to the trade to give notice of the pendency of the suit and of the claims made by him where he acts in good faith and limits the claims to the allegations of the bill. He may accompany such notices with threats to sue others, including customers of the defendant and users of his product, provided he does not go beyond protecting his rights and does not try to intimidate persons who could not be under legal liability for using or selling his competitor's product."

The court in *International Union v. Becherer*, 142 *N. J. Eq.* 561 (*Ch.* 1948), affirmed "the undoubted right to publish to the world the fact of the pendency of a suit and the nature thereof providing he (complainant) reports those things truthfully," but pointed out willful misrepresentation was beyond the scope of the privilege and would be a bar to relief. Accord: *Kem Products Co. v. Levin*, 117 *N. J. Eq.* 560 (*Ch.* 1935).

A suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings. The doctrine has been the basis for denying relief where the complainant has been guilty of larcenous conduct relating to documents involved in the suit, *Gluck v. Rynda Development Co.*, 99 *N. J. Eq.* 788 (*Ch.* 1926); affirmed, 100 *N. J. Eq.* 554 (*E. & A.* 1927), or has

withheld or given false testimony regarding material facts so as to deceive the court. *Clickner v. Clickner,* 95 *N. J. Eq.* 479 *(Ch.* 1924); *Pfender v. Pfender,* 104 *N. J. Eq.* 107 *(Ch.* 1929); affirmed 105 *N. J. Eq.* 247 (*E. & A.* 1929); *Philip A. Singer & Bro., Inc., v. A. Hollander & Son, Inc.,* 104 *N. J. Eq.* 352 *(Ch.* 1929); *Zearfoss v. Zearfoss,* 112 *N. J. Eq.* 530 *(Ch.* 1933).

The doctrine, however, is not so rigid nor should it be so construed as to allow or permit an unconscionable gain to the wrongdoer at the complainant's expense. In cases of this kind the court should not invoke the principle where there has been no misrepresentation or fraud and the suitor has acted upon the advice of counsel. To permit such a windfall to the wrongdoer would do violence to equity and good conscience. *Rasmussen v. Nielsen,* 142 *N. J. Eq.* 657 (*E. & A.* 1948).

Here the advertisement did not include any misrepresentation of fact and was used after the institution of suit. The publication was made in reliance on counsel and wholly in good faith in an endeavor to preserve trade secrets which appellant believed it was entitled to protect.

The circumstances under which the publication was made were not such as to warrant the application of the doctrine of clean hands so as to bar the relief sought. To dismiss the suit for that sole reason would result in a substantial gain to the respondents though they had been clearly guilty of continuous culpable and fraudulent misconduct. Equity will not close its eyes to the full factual situation. Assuming but not deciding the publication to be wrongful, it was not such as to justify the closing of the doors to equitable relief which would otherwise have been granted. Only in the case of intentional serious wrongdoing, which is not here present, should the court dismiss the bill and thus assure the success of the opponent's fraud.

The covenants in paragraphs 2 and 3 in the employment contract to perform faithfully the assigned duties, not to divulge trade secrets or processes or use them for personal profit, to turn over to the employer all new discoveries made

by Singer and not to engage in other businesses during the term of employment, are clearly reasonable demands which the employer may exact from his employee. *Taylor Iron & Steel Co. v. Nichols et al., 73 N. J. Eq.* 684 (*E. & A.* 1908). The validity of these covenants cannot be and is not disputed but it is claimed breaches thereof have not been established. The record fully supports the conclusion that each restriction has been violated by Singer and, through participation in the conspiratorial plan, by each of the other respondents.

Respondents' strongest fire is directed at the validity of the covenants not to engage in any branch of the fur dressing and dyeing business and the suspension clause, from which they conclude Singer's competitive activity was not unlawful.

█ Covenants against post-employment competition receive judicial sanction where the prohibition is reasonably necessary for the protection of the business of the employer, is not unreasonably restrictive in point of time or territory upon the rights of the employee, and is not prejudicial to the public interests. *Sarco Co. of N. J. v. Gulliver, 3 N. J. Misc.* 641 (*Ch.* 1925); affirmed, 99 *N. J. Eq.* 432 (*E. & A.* 1926); *Ideal Laundry Co. v. Gugliemone, 107 N. J. Eq.* 108 (*E. & A.* 1930); *Original N. Y. Furriers Co. v. Williams, 133 N. J. Eq.* 524 (*Ch.* 1943); *Irvington Varnish & Insulator Co. v. Van Norde, 138 N. J. Eq.* 99 (*E. & A.,* 1946); *Silbros, Inc., v. Solomon, 139 N. J. Eq.* 528 (*Ch.* 1947).

█ The validity of the covenant is not predicated on methods or processes secret in fact and revealed to the employee in confidence but rests on the protection afforded an employer against disclosure of business and industrial methods and processes used, records compiled and customer contacts made in the employment. *Kislak v. Muller,* 100 *N. J. Eq.* 110 (*Ch.* 1926); *Ideal Laundry Co. v. Gugliemone, supra; Credit Rating Service, Inc., v. Charlesworth, 126 N. J. Eq.* 360 (*Ch.* 1939); *Irvington Varnish & Insulator Co. v. Van Norde, supra; Pilgrim Coat, Apron & Linen Service, Inc., v. Krzywulak, 141 N. J. Eq.* 212 (*Ch.* 1948).

██ The fact the employee's services are not of a kind requiring unique skill and ability is immaterial as the main

problem is the reasonable protection to the employer against competition by the employee who has received consideration for the covenant. *Sarco Co. of N. J. v. Gulliver, supra; Vander May v. Schoone-Jongen,* 128 *N. J. Eq.* 336 (*Ch.* 1940). Where the employee through his employment has learned of the business practices and methods of his employer which if disclosed to a competitor may result in irreparable injury to the complainant, the court may presume irreparable injury will ensue from the breach of the covenant. *Ideal Laundry Co. v. Gugliemone, supra; Capital Laundry Co. v. Vannozzi,* 115 *N. J. Eq.* 26 (*Ch.* 1933) ; *Credit Rating Service, Inc., v. Charlesworth, supra.*

Although previous to the association with Hollander Singer admittedly was highly skilled, during the employment he was placed in a special position to learn the various secret formulae and processing methods of Hollander. Through possession of the formula books and supervision of the dye house, he became intimately acquainted with and fully cognizant of the very core of Hollander's successful operations. This information was of substantial value and of such vital importance as to warrant the company in taking the greatest precautions in attempting to fashion a cloak of ample protection. In addition, Singer's discovery of a new dye formula, which under the employment agreement became the property of Hollander, was clearly in the category of a business secret. It was that formula which was extensively used by Imperial in competing with Hollander.

While it is admitted the covenant not to compete is reasonable as to time and territory, the contention is made the covenant is too broad since it bars Singer from engaging "in any branch of the fur dressing or fur dyeing industry.". To restrict the validity of the covenant to a particular fur process or sphere of activity of the business, as contended, would in part or completely nullify its effectiveness. The work done by Hollander changed with varying styles and the general supervisory nature of Singer's employment provided ample justification for the broad scope of the covenant. Similarly broad restrictions have already either expressly or im-

pliedly been upheld despite employment of a much narrower scope. *Sternberg v. O'Brien*, 48 *N. J. Eq.* 370 (*Ch.* 1891); *Owl Laundry Co. v. Banks*, 83 *N. J. Eq.* 230 (*Ch.* 1914); *Kislak v. Muller, supra; A·. Fink & Sons v. Goldberg*, 101 *N. J. Eq.* 644 (*Ch.* 1927); *Ideal Laundry Co. v. Gugliemone, supra; Capital Laundry Co. v. Vannozzi, supra; Irvington Varnish & Insulator Co. v. Van Norde, supra.*

The argument is made the suspension clause contained in paragraph 8 is invalid and as such carries with it the covenant contained in paragraph 4. Its fatal weakness is ascribed to the involuntary idleness in which the employee is placed.

The purpose of the clause is to protect Hollander from an employee it suspects but cannot prove is violating the portions of the agreement protecting trade methods· and secrets. Considering the nature of the employer's business, the secrecy of its formulae and processes and the broad supervisory duties of Singer, it cannot be said the clause was an unreasonable restriction for the protection of the employer's business. In the other hand, Singer is not deprived of a livelihood but ·specifically receives his usual compensation during the period of suspension. His position as to its financial return is the same as if he were allowed to pursue his usual duties. Under the circumstances, the suspension provision cannot be deemed unlawful.

The validity of the covenants and the breaches being established, it necessarily follows that Imperial Corporation, Caruba and Villani, by participating in the undercover activities, were properly joined in these proceedings. The protection afforded an employer through the enforcement of the covenants not to compete nor to divulge trade methods or secrets extends against third persons who, knowing of the employee's obligation, may profit from his disclosure. This is true although the third party might have reached the same result independently by his own experiments or efforts. *Stone v. Grasselli Chemical Co.*, 65 *N. J. Eq.* 756 (*E. & A.* 1903). A stranger and its employees may be enjoined where, with knowledge of the employee's covenant and in violation thereof, the stranger applies to his own use the property of the com-

plainant. *Fleckenstein Bros. Co. v. Fleckenstein,* 66 *N. J. Eq.* 252 (*Ch.* 1904) ; *Vander May v. Schoone-Jongen, supra.*

 The appellant has established its right to injunctive relief and an accounting of the profits made by respondents. *Sarco Co. of N. J. v. Gulliver, supra; A. Hollander & Son v. Singer, supra.* The requested injunctive aid not rendered moot by the passage of time is allowed and an accounting will be made of respondents' profits arising out of the operations involved. *Mantell v. International Plastic Harmonica Corp. et al.,* 138 *N. J. Eq.* 562 (*Ch.* 1946) ; modified, 141 *N. J. Eq.* 379 (*E. & A.* 1947) ; *Schechter v. Friedman,* 141 *N. J. Eq.* 318 (*E. & A.* 1948). In that determination Singer is not entitled to retain the salary paid to him during suspension amounting to $15,000. These payments were made at a time when he was actively pursuing outside business activities contrary to the employment agreement.

We find no error in the assessment of the second master's fees against respondents and the denial of costs and counsel fees to either party.

After an examination of the record, the findings of fact made by the Vice-Chancellor and incorporated in the final decree are affirmed. The judgment of the court below is reversed in so far as it denies relief to the appellant and the cause is remanded for proceedings not inconsistent with this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD, BURLING and ACKERSON—6.

*For affirmance*—None.