CENDANT MORTGAGE CORPORA-
TION d/b/a PHH Mortgage Ser-
vices Corporation, Plaintiff,

v.

SAXON NATIONAL MORTGAGE,
Defendant.

No. 99 CV 3161 ADS MLO.

United States District Court,
E.D. New York.

April 3, 2007.

Certilman, Balin, Adler & Hyman, LLP,
East Meadow, NY (Candace Reid Glad-
ston, Thomas J. McNamara, of Counsel),
for Plaintiff.

Wolf & Wolf, Hauppauge, NY (Edward
L. Wolf, of Counsel), Poli & Lamura,
Northport, NY (John G. Poli, of Counsel),
Dollinger, Gonski & Grossman, Carle
Place, NY (Matthew Dollinger, of Coun-
sel), for the Defendant.

## MEMORANDUM OF DECISION
## AND ORDER

SPATT, District Judge.

Currently pending before the Court are objections by the Plaintiff Cendant Mortgage Corporation, d/b/a PHH Mortgage Services Corporation ("PHH" or the "Plaintiff") and the Defendant Saxon National Mortgage ("Saxon" or the "Defendant") to a report and recommendation (the "Report") issued by Chief United States Magistrate Judge Michael L. Orenstein.

Although the Court assumes the parties are familiar with the lengthy procedural and factual background of this case, in the interests of clarity, the Court will restate the pertinent history.

### I. BACKGROUND

### A. Factual Background and Procedural History

On June 4, 1999, PHH, an institutional investor, commenced this action against Saxon, a licensed mortgage banker, seeking specific performance and damages under a Wholesale Mortgage Purchase Agreement (the "Agreement") entered into by the parties on April 21, 1997. Pursuant to the Agreement, the Plaintiff agreed to purchase from the Defendant both government and conventional first mortgage loans. Acting under the Agreement, Saxon sold 13 mortgage loans to Cendant. The Plaintiff claimed that all of the loans contained misrepresentations concerning the borrowers' employment or income in the originating mortgage loan documentation, thereby constituting a breach of the representation and warranty provisions of the Agreement. Pursuant to the terms of the Agreement, as a result of the alleged breach, Saxon was required to repurchase the loans.

On July 17, 2000, PHH moved for summary judgment asserting that the Defendant breached the terms of the Agreement and was liable to the Plaintiff for specific performance and damages. By Memorandum of Decision and Order, dated November 13, 2000, United States District Judge Jacob Mishler found no genuine issue of material fact "on the issue of liability although there is a genuine issue as to the amount of damages." As a result, Judge Mishler granted the Plaintiff's motion on the issue of liability and directed that a trial be held on the issue of damages. On November 28, 2000, the Defendant moved for reconsideration of the November 13, 2000 Decision with regard to the issue of liability. On December 8, 2000, Judge Mishler denied the Defendant's motion for reconsideration.

On December 18 and 28, 2000, the Plaintiff presented evidence on the issue of damages at a bench trial before Judge Mishler. The Plaintiff withdrew three causes of action in connection with three loans. Thus, PHH calculated the compensation due from the Defendant in connection with ten loans. In addition, the Plaintiff submitted an affidavit regarding attorneys' fees incurred and recoverable by the Plaintiff in the action pursuant to the Agreement. After the bench trial, both parties submitted post-trial memoranda of law.

By Memorandum of Decision and Order, dated February 14, 2001, Judge Mishler granted specific performance to the Plaintiff with regard to the loans known as the Craft, Diaz, Salazar and Wright loans and damages on the Vasquez and Munoz loans in the amount of $198,769.22. Subsequently, on February 18, 2001, Judge Mishler issued an Order modifying the February 14, 2001 Decision and granting the Plaintiff specific performance with respect to

the Jeffrey, Ramirez, Rodriguez and Statkevicus loans as well.

On February 28, 2001, Judge Mishler rendered a Judgment (the "Original Judgment") that directed Saxon to deposit the sum of $1,893,431.85, together with interest from January 1, 2001, in PHH's escrow account. In return, PHH was ordered to transfer back to Saxon eight of the mortgages that it had previously sold to PHH. In addition to the specific performance remedy, the Original Judgment awarded monetary damages to PHH in the amount of $198,769.22 and attorneys' fees in the sum of $59,383.13. The Original Judgment further provided that if Saxon failed to make the deposit to PHH's escrow account, "the Court will grant such additional relief as it deems appropriate."

On March 14, 2001, the case was reassigned to this Court and on March 16, 2001, the Defendant moved, pursuant to Rules 52, 59(a)(2), and 60(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P.") for a new trial, and to be relieved from the terms of the Judgment. On September 18, 2004, this Court denied the Defendant's motion, finding that the Defendant had not demonstrated that Judge Mishler's findings of fact and conclusions of law were based on a mistake of fact or clear error of law. In addition, the Court found that Judge Mishler's verdict in favor of the Plaintiff was supported by substantial evidence.

On December 30, 2004, Saxon filed a second motion pursuant to Fed.R.Civ.P. 60(b) seeking relief from the Judgment. PHH also moved under Rule 60(b) to amend the Judgment due to a change in circumstances. On August 13, 2005, the Court issued an Order that denied the second motion by the Defendant and granted the Plaintiff's motion to amend the Judgment due to a change in circumstances. The Court found that during the

three years that Saxon's first motion for reconsideration was pending, six of the mortgages were satisfied by the mortgagors. In addition, PHH had foreclosed on the "Diaz" and "Salazar" mortgages and sold the properties. In these transactions, the "Salazar" property was sold for $28,476.64 in excess of the amount due under the loan, and the "Diaz" property was sold at a loss of $185,656.33.

Recognizing the change in circumstances, the Court granted the Plaintiff's motion; denied the Defendant's motion; cancelled the specific performance part of the judgment; and awarded PHH monetary damages and attorneys' fees "in the same amount [as was] awarded in the [O]riginal Judgment." Although this Court specifically awarded monetary damages in the amount of $209,967.72, this award was made in error. The Court had intended to award $198,769.22, the same damages as were awarded by Judge Mishler in the Original Judgment.

On August 15, 2005, this Court entered an Amended Judgment, setting forth the $209,967.72 monetary damages award. On August 23, 2005, following the entry of the Amended Judgment, the Defendant filed a notice of appeal. On August 25, 2005, the Defendant filed a third motion under Rules 59(e), 60(a) and (b)(1), (2) and 62(b) of the Fed.R.Civ.P. for relief from the Amended Judgment. The Defendant requested that the Court decrease the amount of damages to $10,067.32. The Defendant claimed that the August 2005 Order stated that "PHH does not seek any damages from the loss it sustained on the sale of the 'Diaz' property," and therefore, it should not be liable for the sum of $185,656.33, which is the amount reported lost by PHH on the Diaz loan.

The Plaintiff objected to the Defendant's motion and cross-moved for additional attorneys' fees that were incurred prior to

the entry of the Amended Judgment. PHH claimed that the award of damages in the Amended Judgment properly included damages for the Diaz property, even though the Order stated otherwise. The Plaintiff argued that the Court misstated "PHH does not seek any damages from the loss it sustained on the sale of the 'Diaz' property."

On January 26, 2006, this Court determined that it had erred in awarding damages in the amount of $209,967.72. The Court held that the correct amount of damages was $198,769.22 and that it had not intended to award anything in addition to that sum set forth in Judge Mishler's February 2001 Order. The Court further noted that "[t]o the extent that PHH believes that the Amended Judgment awarded damages for the Diaz property, notwithstanding the Order's explicit direction to the contrary, the Court hereby vacates the Amended Judgment." The Court determined that any other request for damages by the Plaintiff, including a request for damages related to the Diaz mortgage, required a hearing before United States Magistrate Judge Michael L. Orenstein. As a result, this Court granted the Defendant's motion for reconsideration; vacated the August 15, 2005 Amended Judgment; and referred the Plaintiff's application for additional damages to Judge Orenstein for a hearing and Report.

## B. Magistrate Judge Orenstein's Report

On March 17, 2006, pursuant to this Court's January 26, 2006 Order, Judge Orenstein held a hearing with regard to damages that the Plaintiff sustained after the entry of the Original Judgment. Judge Orenstein noted that the parties focused their attention on damages related to the Diaz mortgage. He found that during the pendency of this action, the Plaintiff brought the Diaz mortgage to foreclosure and purchased the property at the foreclosure sale. According to the Referee's Deed, the Plaintiff paid $200,000 on August 11, 2000. However, Judge Orenstein found that, according to the Defendant's exhibits, in a Broker Price Opinion ("BPO"), the Plaintiff's broker valued the property at $325,000 on June 28, 2000. Judge Orenstein further noted that on December 7, 2000, the BPO was $150,000, with a BPO loss of value of $175,000 in five months. Relying on various exhibits submitted by the Plaintiff, Judge Orenstein noted that the Plaintiff claimed that the property's loss of BPO value was attributed to maintenance and cleanup costs, as well as the costs of evicting tenants.

The magistrate judge further found that in March 2001, the Plaintiff entered into a contract for sale of the Diaz property for $150,000. Century 21, Laffey Associates, received a six percent commission for the sale of the Diaz property. However, Century 21, Laffey Associates, also rendered a BPO a few months earlier, in December 2000, valuing the Diaz property at $150,000. Judge Orenstein reviewed the exhibits submitted by the parties, noting that the Plaintiffs presented the BPO's of six comparable properties and the values ranged from $138,000 to $250,000. Judge Orenstein also noted that the Diaz property had a BPO of $325,0000 in June 2000. Plaza Homes purchased the Diaz property in March 2001 and sold the property in October 2001 for more than $400,0000.

Judge Orenstein noted that the Plaintiff's broker appeared to have had a conflict of interest since it rendered a BPO in December 2000 and a few months later brokered a sale and received commission. Judge Orenstein found that although it is not unusual for a broker to give an opinion about the value of property and then bro-

ker a sale, in this case, the property was not advertised or offered to the public in any way. In addition, the property lost more than one-half of its value between June and December 2000.

Judge Orenstein noted that, during the hearing, the Defendant presented the testimony of an expert witness who stated that the property was worth $418,000 in March 2001. Judge Orenstein rejected the expert's opinion, finding that the expert's testimony and report suffered from major deficits. Judge Orenstein found it troubling that the Defendant's expert witness never examined the interior of the property and performed his analysis solely based on a drive by examination. Further, the Court found that the properties used by the expert as comparisons were much newer than the Diaz property.

However, the Court also rejected the $150,000 value for which the Diaz property was sold. The Court found that the Plaintiff failed to demonstrate that $150,000 was the property's value in an open competitive market. The Court also relied on emails submitted by the parties, and specifically, emails in which the Plaintiff's representatives stated that the buyer was getting a steal and that the Plaintiff could sell the property for more than $150,000.

As a result, Judge Orenstein determined that equity and fairness required that the value of the Diaz property in March 2001 be fixed at $250,000. Judge Orenstein ordered the parties to submit objections within 10 days and further ordered the parties to appear before him for the purpose of calculating the Plaintiff's damages based upon the $250,000 value of the Diaz property, after this Court's review of the Report and the parties' objections.

The Plaintiff filed objections to the Report arguing that Judge Orenstein erred in finding that the Plaintiff's broker had a conflict of interest. The Plaintiff further objects to Judge Orenstein's valuation of the Diaz property, arguing that it was justified in selling the property for $150,000 and only had a duty to avoid damages by reasonable effort.

The Defendant filed objections to Judge Orenstein's Report, arguing that its expert appraisal valued the Diaz property at $418,000. The Defendant further argues that there is no basis to fix the value of the property at $250,000 and that the Plaintiff forfeited any award of damages in connection with the Diaz property due to bad faith and unclean hands.

Further, in its objections to the Report, the Defendant claims that its December 2004 motion for reconsideration is still under this Court's consideration because on January 26, 2006, this Court vacated the August 15, 2005 Amended Judgment.

## II. DISCUSSION

### A. As To This Court's January 26, 2006 Order

As previously stated, in its objections to the Report, the Defendant notes that its December 2004 motion for reconsideration is still under review by this Court as a result of the Court's January 26, 2006 Order. Although the Court vacated the Amended Judgment dated August 15, 2005, the Court did not vacate the August 13, 2005 Order. In its August 13, 2005 Order, this Court denied the Defendant's Rule 60(b) motion; granted the Plaintiff's Rule 60(b) cross-motion; awarded monetary relief to the Plaintiff, consistent with the damages determination set forth by Judge Mishler in February 2001; and consequently, relieved the Defendant from satisfying the specific performance elements of Judge Mishler's February 2001 Order. The Court entered the Amended Judgment, erroneously awarding the Plaintiff the sum of $209,967.72, rather

than the $198,769.22 awarded by Judge Mishler.

In the January 26, 2006 Order, this Court granted the Defendant's motion for reconsideration and vacated the August 15, 2005 Amended Judgment, recognizing that it had made an error in setting forth the amount of damages. The Court further vacated the Amended Judgment acknowledging that the Plaintiff sought additional damages in relation to the Diaz property and additional attorneys' fees. However, the Court did not vacate its August 13, 2005 Decision.

As such, the Defendant's December 30, 2004 motion for reconsideration was considered and rejected by this Court on August 13, 2005 and is no longer pending. Although the Defendant's August 25, 2005 motion for reconsideration was granted, it was solely granted in order to correct the erroneous damages calculation; in fact, the Court vacated the Amended Judgment to further remedy that error. Moreover, the Court vacated the Amended Judgment in order to permit the parties to further explore damages incurred by the Plaintiff after Judge Mishler's February 2001 Order.

As such, there are no motions pending before this Court and the open question of damages was referred to Magistrate Judge Orenstein. As such, this Court will address the parties objections to Magistrate Judge Orenstein's Report.

## B. As To The Report

### 1. The Standard of Review

 Rule 72 of the Federal Rules of Civil Procedure and the Federal Magistrates Act, 28 U.S.C. § 636(b)(1)(A), provides the standard for district court review of a federal magistrate judge's order. When this Court reviews a magistrate judge's determination of a nondispositive matter, this Court may overrule the magistrate judge's decision where it is clearly erroneous or contrary to law. *Rubin v. Valicenti Advisory Servs.*, 471 F.Supp.2d 329, 333 (W.D.N.Y.2007) ("The primary distinction between objections made pursuant [to] Rule 72(a) [governing nondispositive matters] and Rule 72(b) [governing dispositive motions] lies in the standard of review applied by the district court. Under Rule 72(a), a magistrate judge's decision can be vacated only if it is clearly erroneous or contrary to law, whereas Rule 72(b) applies a de novo review standard to objections to a magistrate judge's report and recommendation"). "Under the clearly erroneous standard of review of Rule 72(a), the magistrate judge's findings should not be rejected merely because the court would have decided the matter differently. Rather, the district court must affirm the decision of the magistrate judge unless the district court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal citations omitted). In fact, magistrate judges have broad discretion to resolve nondispositive matters. *In re Comverse Tech., Inc. Derivative Litig.*, No. 06–CV–1849, 2006 WL 3511375, **2–3, 2006 U.S. Dist. LEXIS 88261, at *7 (E.D.N.Y. Dec. 6, 2006).

In the Report, the magistrate judge only addresses the valuation of the Diaz property. The Report does not discuss the damages to be awarded or any other dispositive matter. As such, this Court will review the Report pursuant to the clearly erroneous standard.

### 2. As To The Parties' Objections To The Report

Both parties object to Judge Orenstein's valuation of the Diaz property and the fact that he did not accept the values suggested by them. However, pursuant to the clear-

ly erroneous standard, this Court must affirm the decision of the magistrate judge, even if this Court would have decided the matter differently, unless this Court is definitively and firmly convinced that the magistrate judge made a mistake. *Rubin*, 471 F.Supp.2d at 333.

In the present case, the parties have presented no evidence that Judge Orenstein's decision was erroneous. The parties each submitted exhibits to the Court and provided hearing testimony. The Plaintiff claims that the evidence shows that the property was worth $150,000 and the Defendant claims that the Court should have credited the expert's testimony that the property was worth $418,000.

■ Judge Orenstein carefully and thoroughly considered the hearing testimony, as well as the exhibits introduced by the parties. After listening to the testimony of the Defendant's expert witness and reviewing his report, Judge Orenstein determined that his testimony was not credible because he never inspected the interior of the house and unfairly compared the property to much newer properties. After reviewing the hearing testimony and the expert's report, the Court finds that Judge Orenstein made no error in this determination.

Further, although the Plaintiff claims that $150,000 was a reasonable value for the Diaz property, the Plaintiff presents no evidence that the Court's decision was erroneous. Although the Plaintiff acknowledges that the Court quoted from employee emails and cites to additional emails, there is no evidence that Judge Orenstein overlooked any evidence or erroneously relied on the emails provided as exhibits by the parties.

■ There is also no evidence that Judge Orenstein's decision to fix the value of the Diaz property at $250,000 was clear-

ly erroneous. He reasonably considered the varying BPO's, ranging from $150,000 to $325,000, as well as the values of similar properties, ranging from $138,000 to $250,000. There is no evidence of mistake and Judge Orenstein's analysis appears reasonable. As such, the Report is adopted and the value of the Diaz property is fixed at $250,000.

The Plaintiff also objects to Judge Orenstein's statement that the Plaintiff's broker had a conflict of interest. In addition, the Defendant objects to a further hearing on damages arguing that the Court should not award any damages to the Plaintiff. However, these objections have no relevance to Judge Orenstein's overall recommendation regarding the value of the property. Even if the additional objections had merit, any alteration of the Report would not change the overall outcome, which, at this point in the case, is only a determination as to the value of property. Similarly, in *Heron v. Coughlin*, No. 94 CV 1860, 2004 WL 2190917, **1–2, 2004 U.S. Dist. LEXIS 19474, at *4–5 (S.D.N.Y. Sept. 29, 2004), the Court noted that the objections had no bearing on the magistrate judge's recommendation and, therefore, there was no need to address immaterial objections. In addition, in *Dabney v. McGinnis*, No. 97–CV–489A, 2006 WL 1285625, *1, 2006 U.S. Dist. LEXIS 27667, at *2 (W.D.N.Y. May 9, 2006), "the plaintiff challenge[d] certain factual statements in the Report and Recommendation ... The Court f[ound] it unnecessary to resolve these factual discrepancies as they ha[d] no bearing on the legal analysis or conclusion reached by the Magistrate Judge." As such the parties remaining objections are immaterial to Judge Orenstein's valuation of the Diaz property.

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED**, that Chief Magistrate Judge Orenstein's report and recommendation is adopted in its entirety; and it is further

**ORDERED**, that the parties are directed to contact Chief Magistrate Judge Orenstein's chambers to schedule a date for a hearing for the purpose of calculating damages.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

ORENSTEIN, United States Magistrate Judge.

Pursuant to the Memorandum of Decision and Order of District Judge Spatt, dated January 26, 2006, this Court held a hearing for the purpose of reporting and recommending an amount of damages, if any, that plaintiff incurred after the entry of the original judgment. *Memorandum of Decision and Order*, dated January 26, 2006, Spatt, D.J.

Although this Court assumes counsel and the parties are familiar with the long and arduous road traveled to reach this point, it must recite certain findings and revisit the procedural path taken.

In its Memorandum of Decision and Order dated January 26, 2006, the Court granted reconsideration of its August 13, 2005 Order which, among other rulings, granted plaintiff's motion to amend the judgment due to a change in circumstances. *Id.; Order*, dated August 13, 2005, Spatt, D.J.

Thereafter, defendant moved pursuant to Rules 59(e), 60(a) and (b)(1)(2) and 62(b) of the Federal Rules of Civil Procedure for relief from the Amended Judgment entered upon the Order dated August 13, 2005. *Order*, dated August 13, 2005, Spatt, D.J.; *Amended Judgment*, dated August 15, 2005.

In its Memorandum of Decision and Order dated January 26, 2006, District Judge Spatt, granted defendant's motion for reconsideration, vacated the Amended Judgment dated August 15, 2005, and referred plaintiff's application for additional damages, if any, to the undersigned to report and recommend thereon. *Memorandum of Decision and Order*, dated January 26, 2006, Spatt, D.J.

Judge Spatt stated in the January 26, 2006 decision:

> ... any pending request by PHH for damages that was not included in the Original Judgment, such as those associated with the Diaz mortgage, requires a hearing to determine any factual disputes regarding the loss, if any, to PHH, as well as a consideration of any other relevant legal and equitable factors.

*Memorandum of Decision and Order*, dated January 26, 2006 at 9.

In its Order dated August 13, 2005 Judge Spatt found:

> Finally, in this case there is no evidence of 'fraud ... misrepresentation, or other misconduct of an adverse party.' (citation omitted) .... PHH had no duty under the Judgment or the stay of enforcement order to notify the Court or the defendant about the satisfaction of the mortgages, or the sale of the properties.

*Order*, dated August 13, 2005 at 5, Spatt, D.J.

The Memorandum of Decision and Order dated January 26, 2006 did not vacate Judge Spatt's findings and conclusion that PHH did not commit fraud, misrepresentation or other misconduct. However, the January 26, 2006 decision directed that in reviewing PHH's claim of damages that the undersigned consider any other relevant legal and equitable factors. *Memo-*

*randum of Decision and Order,* dated January 26, 2006, Spatt, D.J.

With the procedural posture and Judge Spatt's direction as a foundation this Court issues its Report and Recommendation.

## DISCUSSION

In this action PHH sought equitable and monetary relief. Since the trial on the issue of damages, the landscape changed. Certain mortgages were satisfied and some were satisfied without a loss to PHH. As a result, this case now focuses on the "Diaz" mortgage.

The touchstone of equity is the maxim, "he who seeks equity must do equity." *Lake Waterloo Corp. v. Kestenbaum,* 92 A.2d 478, 10 N.J. 525, 530 (1952)[1]; *Texas Co. v. Di Gaetano,* 187 A.2d 721, 39 N.J. 120, 130 (1963); *see Kelly v. Alstores Realty Corp.,* 613 A.2d 1163, 130 N.J. 313, 317 (1992); *see also A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.,* 66 A.2d 319, 2 N.J. 235, 246 (1949) (holding a "suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings"). Part of that maxim is translated into contract law as "every party to a contract is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assocs.,* 864 A.2d 387, 182 N.J. 210, 224 (N.J.2005); *see Sunset Financial Resources, Inc. v. Redevelopment Group V, LLC,* 417 F.Supp.2d 632, 650–51 (D.N.J.2006) (all contracts governed by New Jersey law have an "implied covenant of good faith and fair dealing" and requires that "neither party will interfere with the other's reasonable expectations under the contract"); *Travelodge Ho-*

*tels, Inc. v. Elkins Motel Associates, Inc.,* 2005 WL 2656676 (D.N.J. Oct.18, 2005) (under New Jersey law an implied covenant of good faith and fair dealing may be read into all contracts and pursuant to such a covenant "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract"); *Violette v. Ajilon Finance,* 2005 WL 2416986 (D.N.J. Sept.30, 2005) (same); *Wilson v. Amerada Hess Corp.,* 773 A.2d 1121, 168 N.J. 236, 241–44 (2001) ("a covenant of good faith and fair dealing is implied in every contract").

The *Violette* court clearly set forth the teachings of *Brunswick.* The *Violette* court distilled three rules from *Brunswick:*

> (1) [t]he party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties; (2)[a] defendant may be liable for a breach of a covenant of good faith and fair dealing even if it does not violate an express term of the contract; and (3) [a party] may be entitled to [equitable] relief under the covenant if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose.

*Violette,* 2005 WL 2416986, at *8.

In applying the concept of the three rules, courts in equity have substituted the term wrongdoing for dishonesty in considering the "clean hands" doctrine. *See, e.g., Morrison v. American Int'l Ins. Co.,* 887 A.2d 166, 381 N.J.Super. 532, 887 A.2d 166

---

1. New Jersey law applies herein. *See* Footnote 9 in *Plaintiff's Memorandum of Law on*

*Damages,* filed ECF, docket entry no. 122.

(App.Div.2005); *Goodwin Motor Corp. v. Mercedes–Benz of North America,* 411 A.2d 1144, 172 N.J.Super. 263 (App.Div. 1980); *Faustin v. Lewis,* 427 A.2d 1105, 85 N.J. 507, 511 (1981) (courts "should not grant relief … to a wrongdoer"). In so doing, courts have observed that "[i]t is the effect of the equitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied." *Morrison v. American Int'l Ins. Co.,* 887 A.2d 166, 381 N.J.Super. 532, 887 A.2d 166 (App.Div.2005) (quoting *Untermann v. Untermann,* 117 A.2d 599, 19 N.J. 507, 518 (1955)); *cf. Heuer v. Heuer,* 704 A.2d 913, 152 N.J. 226, 238 (1998) (in considering the "clean hands" doctrine, the inequitable maxim must be for "wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought").

■ The party claiming a breach of the covenant of good faith and fair dealing bears the burden of persuasion to support a conclusion that a party has violated commercially reasonable standards and that such action destroyed another party's reasonable expectations. *Morrison,* 887 A.2d at 173–74, 381 N.J.Super. at 543–44 ( holding it is the party claiming a breach of the covenant of good faith and fair dealing that bears the burden to provide evidence sufficient to support a conclusion that the party "has engaged in some conduct that denied the benefit of the bargain originally intended by the parties"); *see Brunswick,* 864 A.2d 387, 182 N.J. at 225 (same). Thus, if one party or its representative has a conflict of interest in a matter, such conflict should not be ignored because of equitable factors favoring the representative's principal. *See Care of Tenafly, Inc. v. Tenafly Zoning Bd. of Adjustment,* 704 A.2d 1032, 307 N.J.Super. 362 (N.J.Super.A.D. Jan.27, 1998).

### FINDINGS OF FACT

As noted earlier the parties have focused their attention on the "Diaz" mortgage. During the years the action was pending PHH brought the "Diaz" mortgage to foreclosure. PHH purchased the property at the foreclosure sale. According to the Referee's Deed PHH paid $200,000.00 on or about August 11, 2000. *Deft. Exh. A.* According to Defendant's Exhibit D, the plaintiff's broker in a BPO (Broker Price Opinion) valued the property on or about June 28, 2000 at $325,000.00. *Deft. Exh. D.*

According to a handwritten note on Defendant's Exhibit D, on December 7, 2000 plaintiff's BPO on the property was $150,000.00, a BPO loss of value of $175,000.00 in just five months. Deft. Exh. D; Pl. Exh. 3.

According to plaintiff the property's loss of BPO value was attributed to the high maintenance costs to make court ordered repairs to the rental units, clean up refuse from the yard and the costs to evict the tenants. *See e.g.* Deft. Exh. D; Pl. Exhs. 5, 6 and 7; Deft. Exhs. F and I.

The above facts must now be contrasted to the following:

On or about March 16, 2001 plaintiff entered into a contract of sale of the Diaz property in an "as is" condition for a gross sale price of $150,000.00. Pl. Exh. 4. The closing statement reflects that the net proceeds of the sale was $129,733.66.

Curiously, the contract of sale and closing statement stated that the identity of the buyer was Rite Choice Properties. Pl. Exh. 1 and Pl. Exh. 4. Yet, on or about April 20, 2001 when the deed dated March 30, 2001 was recorded or filed with the County Clerk (*see Deft. Exh. B and Pl. Exh. 1* ), the grantee was identified as Plaza Homes LLC. and not Rite Choice Properties.

The BPO of $150,000.00 given on December 7, 2000 was rendered to plaintiff by the real estate brokerage firm of Century 21, Laffey Assoc. Pl. Exh. 3. The broker who received a full six percent commission on the sale was Century 21, Laffey Assoc., the same broker which gave the BPO on December 7, 2000. Pl. Exh. 1.

Plaintiffs Exhibit 3 contains six comparable properties to the Diaz property. The range went from a low of $138,000.00. to a high of $250,000.00. Yet, this Court views the contents of Exhibit 3 and contrasts it with the BPO of five months previously, that is a BPO of $325,000.00 for the Diaz property. *Cf.* Pl. Exh. 3 *with* Deft. Exh. D.

By the closing date of March 30, 2001, the evictions were completed or about to be completed and all Court ordered repairs were completed. Plaza Homes, the buyer on March 30, 2001, sold the property on or about October 9, 2001 for over $400,000.00, six months after it purchased the property and 10 months after a BPO of $150,000.00.

This Court finds that plaintiff's broker which rendered the BPO acted with a clear conflict of interest or at least with a serious appearance of impropriety. It rendered a BPO on December 7, 2000, and in early 2001 brokered a sale with six percent commission. A broker giving an opinion of value and brokering a sale is not unusual. However, what is unusual is that in this instance the property was not advertised or offered so that an opportunity existed for prospective buyers to come forward and make offers. Under these circumstances when a broker gives an opinion of value and then brokers a sale without public activity, the transaction has an aura of impropriety. This is so because the prop-

erty somehow lost more than one-half its value between June 28, 2000 and December 7, 2000. The costs of court ordered repairs and costs to evict tenants do not justify the drastic drop in value. If the property was offered publicly an arms length transaction would have been more commercially reasonable.

In fact, defendant attempted to demonstrate that the value of the property on March 21, 2001 was $418,000.00 in the testimony of an offered expert and his report. Deft. Exh. K. However, this Court rejects the defendant's expert opinion and the report. The analysis in the report and the testimony suffers from major deficits.

First, the expert never examined the interior of the property and only "drove by".[2] Second, this Court finds that some of the comparables were much newer than the subject property. In three of the comparables, those of similar age to the subject property rental data was not provided, and in two of the comparable properties, owners resided therein in addition to tenants. Thus, in this Court's view the values given by the expert reflect that there was "simply too great an analytical gap between the data and the opinion proffered". *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142–43, 118 S.Ct. 512, 517–18, 139 L.Ed.2d 508 (1997). In view of the fact that any buyer of the subject property is also an investor, this Court can not give evidentiary value to the expert's report.

This Court also rejects the value of $150,000.00 which plaintiff supports. In addition to the finding above that the BPO of $150,000.00 was affected by the broker's conflict of interest because of the private nature of the transaction, this Court finds that the factors render the $150,000.00 val-

---

**2.** A drive by in March 2006 probably did not reflect the condition that existed in March 2001.

ue unreasonable. Plaintiff failed to demonstrate that the $150,000.00 was the value in an open and competitive market. And, significantly there was no marketing effort demonstrated which might have increased the offer. This Court agrees with the comment in plaintiff's E-mail on March 29, 2001 at 3:55 p.m. Deft. Exh. G. Plaintiff's representative stated "I don't want to budge—the buyer is getting a steal." *Id.* at 3. On the same day at 10:30 a.m. a representative of plaintiff stated in part:

In light of these additional expenses, and combined with the money we have already invested in city mandated repairs, the fact we have spent so much in eviction costs and we have one unit now vacant and 2 others with lock-out dates set—we feel it is in our best interests to let this sale bust.

We want to complete the evictions, order the interior BPO and appraisal of all units (we should, by now, have some idea of the condition of this unit—we have done all kinds of repairs in there, so someone should be able to assess the condition and value of this occupied unit!!), and market the property. If we go on the drive by BPO's, it appears that our value is much higher than the $150k, and we will be able to re-coup some of our losses.... We are certain that we can get more than $150k for this property.

*Id.* at 6.

Therefore based upon the plaintiff's exhibits, defendant's exhibits and the testimony presented herein this Court finds that equity and fairness require that a value of the subject property on the date of the closing, March 30, 2001, be fixed at $250,000.00 instead of $150,000.00.

Based upon the foregoing, this Court directs that counsel appear before the undersigned for the purpose of calculating the plaintiff's damages based upon the $250,000.00 value. However, before such appearance this Court anticipates that the respective parties will file objections to this Report and Recommendation. Accordingly, such appearance should await the District Judge's review and rulings on such objections.

### NOTICE

Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of the date of this Report. Failure to file objections within this period waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir.1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir.1996); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir. 1992).

May 10, 2006.